Steven WYNNE, Plaintiff, Appellant,

v.

**TUFTS UNIVERSITY SCHOOL OF MEDICINE, Defendant, Appellee.**

No. 89–1670.

United States Court of Appeals,
First Circuit.

Reheard Dec. 6, 1990.

Decided April 17, 1991.

Robert Leroux Hernandez, Malden, Mass., for plaintiff, appellant.

Alan D. Rose with whom James B. Conroy, David A. Bunis, and Nutter, McClennen & Fish, Boston, Mass., were on brief, for defendant, appellee.

Jeffrey Swope, Jeffrey F. Jones, Margaret Wood Hassan, Zick Rubin, and Palmer & Dodge, Boston, Mass., on brief, for Babson College, Boston University, College of the Holy Cross, Johns Hopkins University, Massachusetts Institute of Technology, and the Ass'n of American Medical Colleges, amici curiae.

Before BREYER, Chief Judge, COFFIN, Senior Circuit Judge, CAMPBELL, Circuit Judge, BOWNES, Senior Circuit Judge, TORRUELLA, SELYA and CYR, Circuit Judges.

COFFIN, Senior Circuit Judge.

This appeal addresses the obligation of an academic institution, a university medical school, when it seeks to demonstrate as a matter of law that there is no reasonable means available to accommodate a handicapped person within the meaning of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("the Act").

Appellant Steven Wynne was dismissed from Tufts University School of Medicine after failing numerous courses during successive attempts to complete the first-year program. Wynne, who suffers from a learning disability subsequently diagnosed as dyslexia, claims that the University unlawfully discriminated against him because of his handicap, in violation of the Act, when it refused to modify its testing methods to accommodate his difficulties. He also asserted a state civil rights claim.

The district court granted summary judgment for the University on both claims. It held, with reference to the federal claim, that Wynne was not an "otherwise qualified" handicapped person within the protection of the Act, because he was not able to meet the school's requirements. With reference to the Massachusetts civil rights claim, it held that there was no showing that Wynne had been "threatened, coerced or intimidated," as required by Mass.Gen. Laws Ann. ch. 12, §§ 11H, 11I.

A panel of this court reversed, concluding that Tufts, on the record thus far made, had failed to show as a matter of law that it had no obligation under the Act to accommodate Wynne's handicap by altering its testing methods. It also held that as to one requirement imposed on Wynne, that of auditing courses he previ-

ously had passed, there remained a factual dispute sufficient to bar summary judgment on the civil rights claim. Subsequently, Tufts' petition for rehearing en banc was granted, supplemental memoranda filed, and oral argument held.

We shall first set forth the relevant facts, then a framing of the issue, followed by a legal analysis of the requirements of the Rehabilitation Act as they interact in a university context with the dictates of professional academic judgment. We then, finally, shall assess the adequacy of the evidence offered by Tufts to support summary judgment. We discuss separately the disposition of Wynne's claim under the Massachusetts Civil Rights Act.

## I. *The Facts*

Appellant Wynne, although possessing lower MCAT (Medical College Aptitude Test) scores and undergraduate grades than most Tufts students, was admitted under the school's affirmative action program for minority applicants in 1983. In December of that year he became aware of his difficulty in dealing with written multiple choice examinations; the following spring he had conversations with school officials about his difficulty. At the end of his first year he had failed eight of fifteen courses. Although the school's guidelines provide for dismissal after five course failures, and the Student Evaluations and Promotions Committee and the Student Appeals Committee had both voted to dismiss Wynne, the dean decided to permit him to repeat the first-year program.

During the summer between his first and second years, Wynne underwent a neuropsychological evaluation at the request of the medical school, which arranged and paid for the test. The psychologist began by noting that Wynne had described having difficulties with multiple choice examination questions and experiencing more success on practicum, laboratory, or applied sections of his courses. She summarized his neuropsychological profile as follows:

> [E]valuation reveals average general cognitive abilities with marked variability among individual skills. Significant strengths were noted in conceptual thinking and reasoning abilities. In contrast, Mr. Wynne encountered serious difficulties processing discrete units of information in a variety of domains, both verbal and non-verbal. Formal language testing revealed insecurities in linguistic processing including inefficient retrieval and retention of information. This type of neuropsychological profile has been identified in the learning disabled population.[1]

The difficulties identified by the psychologist impaired Wynne's ability to answer multiple-choice questions, even though he did manage to pass several such examinations. A reading specialist who worked with him after he was dismissed from medical school observed that he had difficulty interpreting "Type K" multiple-choice questions because of their structure, which often includes passive constructions and double and triple negatives.

Wynne began his second exposure to the first-year program with the assistance of counselling, tutors, note-takers, and taped lectures, the nature, quantity, and regularity of which are presently subjects of considerable dispute. In addition to retaking the seven courses he had failed, Wynne also was required to attend classes and take exams in three courses he had passed with low-pass scores. At the end of the year he passed all but two courses, Pharmacology and Biochemistry. The Student Evaluations and Promotions Committee permitted him to take make-up exams in these two courses. He subsequently passed Pharmacology but failed Biochemistry for the third time. The two committees, Student Evaluations and Student Appeals, recommended dismissal and the dean

---

1. Subsequent to Wynne's dismissal from Tufts, he underwent testing at the Massachusetts General Hospital Language Disorders Unit. In a report dated January 9, 1986, the reading therapist who evaluated Wynne observed that the 1984 neuropsychological testing, "which showed weaknesses in sequencing, memory, visual memory and part-whole relationships, taken in conjunction with his academic history, strongly suggests dyslexia."

agreed. Wynne was dismissed from the medical school in September 1985.

In 1986 Wynne filed a complaint with the United States Department of Education Office for Civil Rights alleging discrimination. On January 12, 1987 that office issued its report, finding no discrimination. A year later Wynne filed suit, alleging that Tufts' treatment of him constituted discrimination on the basis of his handicap. Although the record contains references to various supposed faults in Tufts' response to his disability,[2] Wynne's brief on appeal ties his claim of discrimination solely to the school's failure to offer an alternative to written multiple choice examinations. We therefore treat the appeal as limited to this issue.

## II. *Framing the Issue*

The district court initially denied Tufts' motion for summary judgment because "questions of fact remain regarding both the reasonableness of the accommodations made by the defendant and the extent to which defendant adhered to the program it did devise for plaintiff." Tufts moved for reconsideration, arguing that "[i]f the only remaining questions of fact concern the reasonableness of Tufts' accommodations and the extent to which Tufts adhered to those accommodations, then Tufts is entitled to judgment as a matter of law. If Mr. Wynne is not an 'otherwise qualified handicapped individual,' then it is immaterial for Rule 56 purposes whether Tufts made reasonable accommodations or adhered to them."

Wynne opposed reconsideration, arguing that "he would be able to satisfy defendant's reasonable academic requirements but for its refusal to accommodate him in the means of testing." The district court subsequently allowed the motion for reconsideration and also the motion for summary judgment, saying:

The record is undisputed that plaintiff failed eight of fifteen courses during his first year; he again failed two of the eight when he repeated the first year and one, biochemistry, a third time. "An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." *Southeastern Community College v. Davis*, 442 U.S. 397, 406 [99 S.Ct. 2361, 2367, 60 L.Ed.2d 980] (1979). Since plaintiff clearly has not been able to meet the academic requirements of defendant school, he cannot be deemed to be "otherwise qualified." Accordingly, a cause of action under section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1987), does not lie.

The narrow issue before us is the propriety, on this record, of the grant of summary judgment to defendant on the ground that plaintiff was not an "otherwise qualified" handicapped person within the meaning of the Act and the relevant caselaw. Our task is therefore to determine, viewing the evidence in the light most favorable to Wynne, whether he has at least managed to create a genuine and material factual issue regarding his qualifications to pursue a Tufts medical education. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 7–8 (1st Cir.1990).

Before we proceed farther, we pause to underscore the technical procedural issue posed by the posture of this appeal. We do so because of the expansive claims made by the parties and amici on behalf of the rights of handicapped persons under the Act on the one hand and on behalf of academic freedom on the other. At this stage we venture no opinion, directly or indirectly, concerning the merits of appellant's claims or appellee's defenses.

## III. *The Rehabilitation Act and Caselaw: Institutional Obligations*

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individ-

---

**2.** For example, Wynne criticizes the efforts made by Tufts in providing him with tutors, claiming that the school should have given him a special learning disabilities tutor. He also complains that the school failed to provide him with individual subject matter tutors for all of his courses. He also requested that he be allowed to take a reduced course load in his second year.

ual with handicaps in the United States ... shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794.[3]

Our inquiry into the meaning of "otherwise qualified" begins, but does not end, with *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). That case involved a nursing school applicant who was afflicted with a serious hearing disability and whose dependence on lip reading would prevent her from clinical training and limit her in other ways. The court of appeals had set aside a district court finding that plaintiff was not an "otherwise qualified" handicapped individual, reasoning that the Act required the College to consider the application without regard to hearing ability and that it required " 'affirmative conduct' on the part of Southeastern to modify its program to accommodate the disabilities of applicants, 'even when such modifications become expensive.' " *Id.* at 404, 99 S.Ct. at 2366.

The Court, in reversing the judgment, addressed both propositions embraced by the court of appeals. It first rejected the idea that an institution had to disregard any limitation resulting from a handicap, saying, "[a]n otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." *Id.* at 406, 99 S.Ct. at 2367. Second, observing that no action short of a "substantial change" in Southeastern's program would accommodate plaintiff, *id.* at 414, 99 S.Ct. at 2371, and that the Act did not impose an affirmative action obligation on all recipients of federal funds, *id.* at 411, 99 S.Ct. at 2369–70, it held that no such "fundamental alteration" in Southeastern's program was required. *Id.* at 410, 99 S.Ct. at 2369. It also noted that the program, aimed at training persons for "all normal roles of a

registered nurse, represents a legitimate academic policy." *Id.* at 413 n. 12, 99 S.Ct. at 2371 n. 12. The Court did, however, leave open the possibility that an insistence on continuing past requirements notwithstanding technological advances might be "unreasonable and discriminatory." *Id.* at 412–13, 99 S.Ct. at 2370.

The language we have quoted, employed to deal with the absolutist views of the lower court, led other courts to seek only a rational basis for an institution's decision, without imposing any requirement to seek feasible alternative methods of accommodating the essential features of a program to a given disability. In *Doe v. New York University*, 666 F.2d 761 (2d Cir.1981), a student sought readmission to medical school. She had experienced serious psychiatric difficulties of a self-destructive and violent nature and had the disorder classified as "Borderline Personality." The court, giving "considerable judicial deference" to the university, *id.* at 776, saw "the pivotal issue [as] ... whether under all of the circumstances [plaintiff's handicap] provides a reasonable basis for finding the plaintiff not to be qualified or not as well qualified as other applicants." *Id.* It thereupon held that the university had met its burden of showing that plaintiff's disorder was relevant to its reasonable qualifications for admission and that there existed a significant risk that the disorder would reoccur. The court therefore set aside the preliminary injunction granted the plaintiff.

Similarly, in *Doe v. Region 13 Mental Health–Mental Retardation Comm'n*, 704 F.2d 1402 (5th Cir.1983), a former psychiatric worker with acute psychiatric problems of a self-destructive nature challenged her dismissal from a regional mental health center. The court, giving "reasonable deference" to the center, and seeing the issue as "whether there was a substantial, reasonable basis for its decision," *id.* at 1410, relied heavily on *Doe v. New York University* to affirm a judgment for defendant

---

**3.** A handicapped person is one who "has a physical or mental impairment which substantially limits one or more of such person's major life activities...." 29 U.S.C. § 706(8)(B). "Impairment," in addition to covering physiological dis-

orders, includes "any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 34 C.F.R. Ch. 1 (7–1–90 Edition), § 104.3(j)(2)(i).

notwithstanding a plaintiff's verdict. Subsequently, the same circuit, in *Brennan v. Stewart*, 834 F.2d 1248, 1261 (5th Cir.1988), characterized *Region 13* as "read[ing] *Davis* to validate restrictions under a standard of 'meta-reasonableness'; that is, to validate reasonable restrictions; *and* to give 'reasonable deference' to the grantee's *own* determination of the restriction's reasonableness[.]" [Emphasis in original.]

The arguably absolutist principles of *Davis*—a handicapped person must be able to meet *all* requirements of an institution; and there is no affirmative action obligation on an institution—were meaningfully qualified by the Court in *Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). The Court signalled its awareness of criticism that the *Davis* pronouncement on "affirmative action" obscured the difference between "a remedial policy for the victims of past discrimination" and "the elimination of existing obstacles against the handicapped." *Id.* at 300 n. 20, 105 S.Ct. at 720 n. 20. It then distinguished "substantial" and "fundamental" changes (affirmative action) from "changes that would be reasonable accommodations." *Id.* It added this gloss to *Davis:*

> The balance struck in *Davis* requires that an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers. The benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled; to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made.

*Id.* at 301, 105 S.Ct. at 720.

■ Thus, in determining whether an individual meets the "otherwise qualified" requirement of section 504, it is necessary to look at more than the individual's ability to meet a program's *present* requirements. As the court in *Brennan v. Stewart* recognized:

> The question after *Alexander* is the rather mushy one of whether some "reasonable accommodation" is available to satisfy the legitimate interests of both the grantee and the handicapped person. And since it is part of the "otherwise qualified" inquiry, our precedent requires that the "reasonable accommodation" question be decided as an issue of fact....

834 F.2d at 1262. In *Brennan* the Fifth Circuit was considering the rejection of a totally blind applicant for a training permit as a fitter and dispenser of hearing aids because of his obvious inability to meet the requirement of making visual ear examinations. The court set aside the district court's dismissal of applicant's claim and remanded the case for a determination whether there was "some reasonable accommodation ... which meets [claimant's] special needs without sacrificing the integrity of the Board's licensing program." *Id.*

Following on *Davis* and *Alexander,* the Court in *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987), elaborated on how courts should deal with the "otherwise qualified-reasonable accommodation" inquiry. The case involved an elementary school teacher whose long dormant tuberculosis had recently reoccurred several times. The school board dismissed her and she brought suit under the Act. The district court, without making findings as to the duration, severity or contagiousness of the disease, or the availability of reasonable accommodation, held that an elementary school teacher with a contagious disease was not "qualified" to teach elementary school. The court of appeals reversed and remanded for findings as to the risks of infection and the possibility of making some reasonable accommodation. In affirming, the Supreme Court stated:

> The remaining question is whether Arline is otherwise qualified for the job of elementary schoolteacher. To answer this question in most cases, the District Court will need to conduct an individualized inquiry and make appropriate findings of fact. Such an inquiry is essential if § 504 is to achieve its goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes,

or unfounded fear, while giving appropriate weight to such legitimate concerns of grantees as avoiding exposing others to significant health and safety risks.

*Id.* at 287, 107 S.Ct. at 1130–31 (footnote omitted).

In addition to stressing the importance of an individual inquiry and appropriate findings of fact, the *Arline* Court gave guidance on an issue of great importance in the instant case—the deference to be given the institutional decisionmaker. The Court, recognizing that it was dealing with the grave and delicate issue of the employability of a teacher with a contagious disease in an elementary school, cited the suggestion of amicus American Medical Association that findings as to the risks involved should be "based on reasonable medical judgments given the state of medical knowledge." *Id.* at 288, 107 S.Ct. at 1131. The Court held that in making these findings, trial judges normally should defer to the reasonable medical judgments of public health officials. Earlier in the opinion, in responding to the argument that its decision would unwarrantably extend the Act "beyond manageable bounds," the justices also had observed that "courts may reasonably be expected normally to defer to the judgments of public health officials in determining whether an individual is otherwise qualified unless those judgments are medically unsupportable." *Id.* at 286 n. 15, 107 S.Ct. at 1130 n. 15.

We glean additional insight on the deference issue from the Court's footnote on the limits of "reasonable accommodation," *id.* at 287–88 n. 17, 107 S.Ct. at 1131 n. 17, which cited *Strathie v. Department of Transportation*, 716 F.2d 227, 231 (3d Cir. 1983). The Third Circuit in *Strathie*, noting that *Davis* lacked any discussion on the scope of judicial review, acknowledged the need to accord some measure of judicial deference to program administrators, but rejected a "broad judicial deference resembling that associated with the 'rational basis' test [which] would substantially undermine Congress' intent . . . that stereotypes or generalizations not deny handicapped individuals equal access to federally-funded programs." *Id.* (footnote omitted). So rea-

soning, the court announced the standard apparently referenced in the Court's footnote in *Arline:*

A handicapped individual who cannot meet all of a program's requirements is not otherwise qualified if there is a factual basis in the record reasonably demonstrating that accommodating that individual would require either a modification of the essential nature of the program, or impose an undue burden on the recipient of federal funds.

*Id.*

What we have distilled from *Arline* and *Strathie* is consistent with the well established principle enunciated in *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 225, 106 S.Ct. 507, 513, 88 L.Ed.2d 523 (1985) (footnote omitted): "When judges are asked to review the substance of a genuinely academic decision, . . . they should show great respect for the faculty's professional judgment." The question in *Ewing* was whether a university had violated substantive due process (i.e., had engaged in wholly arbitrary action) in dropping plaintiff from an academic program after plaintiff had failed several subjects and received the lowest score so far recorded in the program. This was a context where no federal statutory obligation impinged on the academic administrators; their freedom to make genuine academic decisions was untrammeled. This is why the Court added to the above quoted passage the sentence: "Plainly, [judges] may not override [the faculty's professional judgment] unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Id.*

■ In the context of an "otherwise qualified-reasonable accommodations" inquiry under the Rehabilitation Act, the same principle of respect for academic decisionmaking applies but with two qualifications. First, as we have noted, there is a real obligation on the academic institution to seek suitable means of reasonably accommodating a handicapped person and to

submit a factual record indicating that it conscientiously carried out this statutory obligation. Second, the *Ewing* formulation, hinging judicial override on "a substantial departure from accepted academic norms," is not necessarily a helpful test in assessing whether professional judgment has been exercised in exploring reasonable alternatives for accommodating a handicapped person. We say this because such alternatives may involve new approaches or devices quite beyond "accepted academic norms." As the Court acknowledged in *Davis*, "[t]echnological advances can be expected to enhance opportunities to rehabilitate the handicapped or otherwise to qualify them for some useful employment." 442 U.S. at 412, 99 S.Ct. at 2370.[4]

It seems to us that the case before us, where the adversaries are an individual and an academic institution, involves a set of conflicting concerns suggestive of those in cases where an individual seeks damages from a government official for allegedly abusing his office. *See, e.g., Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982). Just as in this case concern for the statutory rights of a handicapped individual is in tension with concern for the autonomy of an academic institution, so in the official conduct setting is concern for protecting individual constitutional rights in tension with concern for insulating officials from personal monetary liability and harassing litigation that would unduly inhibit discharge of their duties.

The tension has been resolved in the official conduct setting by according qualified immunity from civil damages to government officials for actions that did not violate clearly established rights. In many cases, where the material facts have not been disputed, courts have been able to determine whether qualified immunity is applicable as a matter of law without extensive proceedings. We believe a similar though not identical approach is appropriate to assess whether an academic institution adequately has explored the availability of reasonable accommodations for a handicapped individual. If the institution submits undisputed facts demonstrating that the relevant officials within the institution considered alternative means, their feasibility, cost and effect on the academic program, and came to a rationally justifiable conclusion that the available alternatives would result either in lowering academic standards or requiring substantial program alteration, the court could rule as a matter of law that the institution had met its duty of seeking reasonable accommodation. In most cases, we believe that, as in the qualified immunity context, the issue of whether the facts alleged by a university support its claim that it has met its duty of reasonable accommodation will be a "purely legal one". *See Mitchell v. Forsyth,* 472 U.S. 511, 528 n. 9, 105 S.Ct. 2806, 2816 n. 9, 86 L.Ed.2d 411 (1985). Only if essential facts were genuinely disputed or if there were significantly probative evidence of bad faith or pretext would further fact finding be necessary.

---

**4.** A case illustrating the different approaches suitable in addressing an "otherwise qualified" issue and a typical academic authority issue is *Doherty v. Southern College of Optometry,* 862 F.2d 570 (6th Cir.1988), involving a plaintiff afflicted with both a visual impairment and a neurological condition. After his first year at optometry school, he failed newly imposed clinical proficiency examinations on the use of several instruments. In attacking his dismissal, he brought both a Rehabilitation Act claim alleging that the school had not made a reasonable accommodation by waiving the clinical instrument tests and a contract claim alleging that the school had broken its contract with him by adding the testing requirement. The district court ruled for the defendant on the former but refused to direct a verdict on the latter, on which a jury found for plaintiff.

In reviewing the "otherwise qualified-reasonable accommodation" issue, the court noted the testimony of expert witnesses supporting the district court's finding in favor of the school and held that it was not clearly erroneous. *Id.* at 574. As for the contract claim, the court began its analysis of state contract law only after detailed and explicit consideration of *Ewing* and other cases urging "the greatest reluctance" before undertaking judicial intervention. *Id.* at 576. The court reversed and ordered judgment for the school on this claim.

## IV. *Appropriateness of Summary Judgment*

█ The district court, in granting Tufts' motion for summary judgment, explicitly relied on the fact that Wynne had failed eight of his first year courses, two of the eight a second time, and one a third time. Following the literal language of *Davis* that an "otherwise qualified person" must meet "all of a program's requirements," 442 U.S. at 406, 99 S.Ct. at 2367, the court felt compelled to grant the motion. As we have indicated in our review of the caselaw, *Alexander* in effect modified the "all" language of *Davis* and articulated the obligation to make reasonable accommodation part of the "otherwise qualified" inquiry.

If the record were crystal clear that even if reasonable alternatives to written multiple-choice examinations were available, Wynne would have no chance of meeting Tufts' standards, we might be able to affirm on a different ground from that relied on by the district court. But although Wynne has an uphill road to travel, with much to indicate that he has cognitive and other problems that are independent of his difficulties with multiple-choice examinations, we do not think the record permits this course. The results of his neuropsychological evaluation after his first year indicated average general cognitive abilities and well-developed skills in conceptual reasoning and abstract problem solving; he did pass most of his exams; he scored substantially higher in time-measured "practicum," a form of examination requiring him to apply his knowledge to a problem; he assertedly read and digested information from medical journals for his master's thesis; he read and assimilated computer-generated data in his Hematology course, which was successfully completed; experts asserted that he had the ability and motivation to improve his language skills. Whatever may be the ultimate outcome, we think that on the record as made thus far Tufts had the obligation of demonstrating that its determination that no reasonable way existed to accommodate Wynne's inability to perform adequately on written multiple-choice examinations was a rea-soned, professional academic judgment, not a mere ipse dixit.

Tufts' submission on this issue consisted of an affidavit from the Dean of its School of Medicine, Dr. Henry Banks. Three paragraphs concern written multiple-choice (Type K) examinations. The first stated the test's purpose: "to measure a student's ability not only to memorize complicated material, but also to understand and assimilate it." The second, and major, paragraph stated:

> In the judgment of the professional medical educators who are responsible for determining testing procedures at Tufts, written multiple choice (Type K) examinations are important as a matter of substance, not merely of form. In our view, the ability to assimilate, interpret and analyze complex written material is necessary for the safe and responsible practice of modern medicine. It is essential for practicing physicians to keep abreast of the latest developments in written medical journals. Modern diagnostic and treatment procedures often call for the reading and assimilation of computer-generated data and other complex written materials. Frequently, and often under stressful conditions fraught with the most serious consequences, physicians are called upon to make choices and decisions based on a quick reading, understanding and interpretation of hospital charts, medical reference materials and other written resources. A degree from the Tufts University School of Medicine certifies, in part, that its holder is able to read and interpret such complicated written medical data quickly and accurately.

The third paragraph asserted that it was the judgment of "the medical educators who set Tufts' academic standards" that the above described demands "are best tested ... by written, multiple choice examinations."

Under *Arline* a court's duty is first to find the basic facts, giving due deference to the school, and then to evaluate whether those facts add up to a professional, academic judgment that reasonable accommo-

dation is simply not available. The above quoted affidavit, however, does not allow even the first step to be taken. There is no mention of any consideration of possible alternatives, nor reference to any discussion of the unique qualities of multiple choice examinations. There is no indication of who took part in the decision or when it was made. Were the simple conclusory averment of the head of an institution to suffice, there would be no way of ascertaining whether the institution had made a professional effort to evaluate possible ways of accommodating a handicapped student or had simply embraced what was most convenient for faculty and administration. We say this, of course, without any intent to impugn the present affiant, but only to attempt to underscore the need for a procedure that can permit the necessary minimum judicial review.

We therefore set aside the summary judgment and remand this issue for further proceedings. As is evident from our discussion, the court will be free to consider other submissions, to enter summary judgment thereon if they meet the standard we have set forth, or to proceed with further fact-finding if such should prove necessary.

### V. *The State Civil Rights Claim*

■ The Massachusetts Civil Rights Act, Mass.Gen.Laws Ann. ch. 12, §§ 11H and I, provides a remedy when an individual interferes with another person's constitutional or statutory rights by "threats, intimidation or coercion." As we have noted, the district court granted summary judgment to Tufts on this claim after noting the absence of any such threat, intimidation, or coercion.

Wynne claims that he was "coerced" to sign a document specifying the manner in which he would be required to repeat the first-year program. The document, in the form of a letter to Wynne, stated that he must repeat the eight courses he had failed, audit three courses that he had narrowly passed, and take other steps designed to improve his academic performance, including taping all lectures, arrang-

ing for a notetaker and receiving tutoring in the courses he had failed.

On appeal, Wynne relies on his description of a meeting with a dean of the school:

On or about November 15, 1984, Dr. Marilyn Griffin, M.D. attempted to coerce and intimidate me in signing a contract for the 1984–85 academic year, which I was unwilling to sign. Despite my repeated objections, she repeatedly insisted that I sign the document, using profanity directed towards me. She then actually forced the contract into my hand.

In fact, Wynne did not sign this document but signed another letter on November 21, in which, after intervention by two faculty members, certain language he had objected to was eliminated. Wynne avers generally that he was coerced into signing this document.

Much of the argument between the parties has centered on whether the above incident, accepting Wynne's version of it, constituted a "physical confrontation accompanied by a threat of harm" as required by *Layne v. Superintendent, Mass. Correctional Inst., Cedar Junction*, 406 Mass. 156, 158, 546 N.E.2d 166, 167 (1989). Wynne has argued that a threat need not be of physical harm, citing the Supreme Judicial Court's reference in *Bally v. Northeastern University*, 403 Mass. 713, 719–20, 532 N.E.2d 49, 53 (1989), to *Redgrave v. Boston Symphony Orchestra*, 399 Mass. 93, 502 N.E.2d 1375 (1987), saying: "Although *Redgrave* did not involve physical confrontation, the Boston Symphony Orchestra's action involved the loss of a contract right ... a threat of serious harm." Tufts, on the other hand, invokes *Longval v. Commissioner of Correction,* 404 Mass. 325, 333, 535 N.E.2d 588, 593 (1989), in which the Supreme Judicial Court opined that the failure to hold a hearing prior to transfer of a prisoner to a segregated unit did not "readily compare to the sort of threatening, intimidating, or coercive conduct that would be a violation of the State Civil Rights Act."

We see no need to resolve the question whether or when a "threat" may go beyond one of physical violence to be countenanced

by the Massachusetts Act. We do know that, even though the protection given by that act is not merely against state action, the Supreme Judicial Court has no intention of "creating a vast constitutional tort." *Bell v. Mazza*, 394 Mass. 176, 182, 474 N.E.2d 1111, 1115 (1985). The court also has stated that words which "express an intention to use lawful means ... would not be a threat, intimidation, or coercion actionable under § 11I." *Pheasant Ridge Associates Limited Partnership v. Burlington*, 399 Mass. 771, 782, 506 N.E.2d 1152, 1159 (1987). *See also Smith v. Longmeadow*, 29 Mass.App.Ct. 599, 603, 563 N.E.2d 697 (1990).

It seems to us that the action of Tufts in requiring a series of steps tailored to help a student overcome his past academic difficulties falls outside the scope of the civil rights act. Tufts' actions were not aimed at influencing Wynne to compromise his rights; the school was attempting, even if inadequately, to meet Wynne's needs. This simply does not "readily compare to the sort of threatening, intimidating, or coercive conduct that would be a violation of the State Civil Rights Act," *Longval*, 404 Mass. at 333, 535 N.E.2d at 593.

Thus, even if Tufts violated section 504 by failing adequately to accommodate Wynne's disability, we reject his contention that the steps Tufts did take amounted to a violation of the state civil rights act.

*We therefore affirm the action of the district court in granting summary judgment for Tufts on Count I of the complaint (Civil Rights count).*

*The action of the district court in granting summary judgment to Tufts on Count II of the complaint (Rehabilitation Act count) is reversed and the case is remanded for further proceedings in accordance with this opinion.*

BREYER, Chief Judge, with whom LEVIN H. CAMPBELL and TORRUELLA, Circuit Judges, join (dissenting).

I agree with what I take as the majority's statement of the law. First, Tufts must make a "reasonable accommodation" to Mr. Wynne's handicap. *See Alexander v. Choate*, 469 U.S. 287, 301, 105 S.Ct. 712, 720, 83 L.Ed.2d 661 (1985). Second, in determining what is "reasonable," a court must examine a host of case-specific circumstances. *See School Bd. v. Arline*, 480 U.S. 273, 287, 107 S.Ct. 1123, 1130–31, 94 L.Ed.2d 307 (1987). Here, I believe those circumstances include the potential disadvantage to the disabled person, the nature of the disability, the degree of potential harm to the institution, and the comparative expertise (of courts and private parties) in making the relevant factual assessments relevant to harms, needs, and likely institutional consequences. Third, as the majority says, in the context of academic testing before us:

> If the institution submits undisputed facts demonstrating that the relevant officials within the institution considered alternative means, their feasibility, cost and effect on the academic program, and came to a rationally justifiable conclusion that the available alternatives would result either in lowering academic standards or requiring substantial program alteration, the court could rule as a matter of law that the institution had met its duty of seeking reasonable accommodation.

*Ante* at 26. Fourth:

> "In the context of an 'otherwise qualified-reasonable accommodations' inquiry under the Rehabilitation Act, the ... principle of respect for academic decisionmaking applies...."

*Ante* at 25; *cf. Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225, 106 S.Ct. 507, 513, 88 L.Ed.2d 523 (1985).

These principles and statements amount to a holding that Mr. Wynne cannot achieve ultimate victory in this case if the record shows (without "genuine" and "material" factual disputes, Fed.R.Civ.P. 56(c)) (1) that academic decision makers exercised their professional judgment in deciding what tests to use (they "considered alternative means") and (2) that their decision does not significantly depart from accepted academic norms (it is a "rationally justifiable conclusion"). I agree with this holding.

I disagree, however, with the majority's application of these principles to the facts in this record. The record contains an affidavit of the Dean of the Tufts University Medical School, a conceded academic expert. That affidavit says:

11. The particular type and form of written, multiple choice (Type K) examinations administered to Mr. Wynne and all first year Tufts students is expressly designed to measure a student's ability not only to memorize complicated material, but also to understand and assimilate it.

12. In the judgment of the professional medical educators who are responsible for determining medical testing procedures at Tufts, written multiple choice (Type K) examinations are important as a matter of substance, not merely of form. In our view, the ability to assimilate, interpret and analyze complex written material is necessary for the safe and responsible practice of modern medicine. It is essential for practicing physicians to keep abreast of the latest developments in written medical journals. Modern diagnostic and treatment procedures often call for the reading and assimilation of computer-generated data and other complex written materials. Frequently, and often under stressful conditions fraught with the most serious consequences, physicians are called upon to make choices and decisions based on a quick reading, understanding and interpretation of hospital charts, medical reference materials and other written resources. A degree from the Tufts University School of Medicine certifies, in part, that its holder is able to read and interpret such complicated written medical data quickly and accurately.

13. It is the judgment of the medical educators who set Tufts' academic standards and requirements that this and other important aspects of medical training and education are best tested and evaluated by written, multiple choice examinations of the type given to Mr. Wynne and all of his peers.

The affidavit speaks of the "judgment of professional medical educators." It says that, in "the judgment of medical educators who set Tufts' academic standards and requirements," the demands of medicine "are *best* tested" by a multiple-choice exam. This language seems to me to say that experts considered the fairly obvious alternatives (oral exams or essay-type written exams) and concluded that written multiple-choice exams were *"best."*

The affidavit explains *why* these educators believe that multiple-choice examinations are best. The affidavit indicates that "the unique qualit[y] of multiple choice examinations," *see ante* at 28, is that these examinations are "expressly designed to measure a student's ability not only to memorize complicated material, but also to understand and assimilate it." The alternatives to written multiple-choice exams—oral or essay-type—obviously do not test reading comprehension.

These statements are basically undisputed. Mr. Wynne does not deny that the persons who made the testing decisions were exercising their professional judgment. The affidavit indicates the use of professional judgment that employed comparisons. And, I do not believe a reasonable fact finder could conclude from the record that insistence upon multiple-choice exams is a "substantial departure from accepted academic norms." I concede that there is evidence that a different medical school, Brown, would permit students such as Mr. Wynne to take an oral examination. But, schools can differ in the importance they attach, say, to reading comprehension. In any event, the fact that one school has a different procedure could not, in my opinion, by itself sustain a finding of a *"substantial* departure from academic norms."

The majority believes I am reading this affidavit too "flexibly" or too liberally in Tufts' favor. I think I am reading it literally. Moreover, I believe it wrong to insist upon more than the statement of subjective, but expert, judgment that it contains, in light of the following features of the case. First, Mr. Wynne's particular disability, a psychological learning disadvantage, is closely related to the kind of characteristic, namely an inability to learn to become a good doctor, to which Tufts reasonably,

and lawfully, need not "accommodate." Second, the designing of tests aimed at screening out those who will not become good doctors is a quintessentially academic task, close to the heart of a professional school's basic mission. Third, the design of proper academic tests (as far as this record is concerned) is not itself a science, but, rather, is a judgmental matter in respect to which teachers and doctors are far more expert than judges and juries.

These three sets of circumstances should caution us against applying reasonable-sounding legal standards in a way that, as a practical matter, would force universities to produce the *kinds* of proofs that seem to appeal especially to courts—"hard" evidence, tests of tests, statistical studies—for to do this is to take a basic educational decision away from those who may know the most about it, teachers using their own subjective judgment and experience, and to place it in the hands of those (say, lawyers) who will have to defend an academic decision in court. That is why, in this case, I would apply the court's test, but, in doing so, I would read the affidavits in what I believe is a common-sense manner, as making clear that Tufts applied the expert professional judgment upon which the majority insists.

Accordingly, I would affirm. Respectfully, I dissent.