Elizabeth **GUCKENBERGER,**
et al., **Plaintiffs,**

v.

**BOSTON UNIVERSITY,**
et al., **Defendants.**

**Civ. A. No. 96–11426–PBS.**

United States District Court,
D. Massachusetts.

May 29, 1998.

Frank J. Laski, Newton, MA, Guy B. Wallace, Laurence W. Paradis, Disability Rights Advocates, Oakland, CA, William J. Hunt, William F. Ahern, Jr. Henry W. Clark, Clark, Hunt & Embry, Cambridge, MA, Sidney Wolinsky, Sid Wolinsky, Disability Rights Advocates, Oakland, CA, for Elizabeth Guckenberger, Maclean Ports Bishop, Avery Labrecque, Andrea Schneider, Benjamin Freedman, Jill Cutler, Scott Greeley, Michael Cahaly, Jordan Nodelman, Association for Higher Education and Disabilities, Children and Adults With Attention Deficit Disorder, Orton Dyslexia Society, Boston University Law Disability Caucus.

Lawrence S. Elswit, Office of the General Counsel, Michael B. Rosen, Office of the General Counsel, Boston, MA, Judith A. Goldberg, McDermott, Will & Emory, Boston, MA, Alan D. Rose, Rose & Associates, Boston, MA, Erika Geetter, Boston University, Office of the General Counsel, Boston, MA, Dale C. Kerester, Lynch, Brewer, Hoffman & Sands, Boston, MA, Jo Anne Simon, Law Offices of Jo Anne Simon, Brooklyn, NY, for Boston University, Jon Westling, Craig Klafter, Loring Brinkerhoff.

Reed Martin, Law Office of Reed Martin, Houston, TX, for National Learning Disability Association.

Sidney Wolinsky, Disability Rights Advocates, Oakland, CA, for Disability Rights Advocates.

## MEMORANDUM AND ORDER ON THE ISSUE OF COURSE SUBSTITUTIONS

SARIS, District Judge.

### INTRODUCTION

A class of students with learning disabilities brought this action against defendant Boston University ("BU") alleging that BU's policies toward them violated the Americans With Disabilities Act ("ADA"), 42 U.S.C.

§§ 12101–12213, the Rehabilitation Act, 29 U.S.C. § 794, and state law. The Court issued its findings of fact, conclusions of law, and order of judgment on August 15, 1997, after a ten-day bench trial. *See Guckenberger v. Boston Univ.*, 974 F.Supp. 106 (D.Mass.1997) (*"Guckenberger II"*).[1] In paragraph two of its order, the Court required BU to propose and to implement a "deliberative procedure" for considering whether course substitutions for the foreign language requirement of BU's College of Arts and Sciences (the "College") would "fundamentally alter the nature" of BU's undergraduate liberal arts degree. *Id.* at 154–55. BU, using the College's existing Dean's Advisory Committee to consider the issue, decided that course substitutions would constitute such a fundamental alteration. Plaintiffs challenge that determination. After hearing, the Court holds that BU has complied with the order.

## BACKGROUND

### A. *Procedural History*

As part of a wholesale attack on BU's policies toward the learning disabled, plaintiffs alleged that BU's refusal to allow learning disabled students at the College to satisfy its foreign language requirement by completing selected non-language courses constituted a violation of federal and state discrimination law. Unlike some other portions of the case, the dispute over foreign language course substitutions involves *only* the College of Arts and Sciences and not other BU faculties. The Court rejected plaintiffs' sweeping argument that "any across-the-board policy precluding course substitutions" violates discrimination law. *Id.* at 149. Rather, the Court concluded that "neither the ADA nor the Rehabilitation Act requires a university to provide course substitutions that the university rationally concludes would alter an essential part of its academic program." *Id.* Plaintiffs did not appeal this or any other aspect of the Court's order of judgment.

Plaintiffs were successful, however, in pressing an inquiry into reasonable accommodation. Based on an administrative regulation that course substitutions "might" be a reasonable means of accommodating the disabled, 34 C.F.R. Pt. 104, App. A ¶ 31 (1997), and evidence introduced at trial, the Court held that plaintiffs had "demonstrated that requesting a course substitution in foreign language for students with demonstrated language disabilities is a reasonable modification." *Guckenberger II,* 974 F.Supp. at 147. Therefore, the burden of demonstrating "that the requested course substitution would fundamentally alter the nature of [BU's] liberal arts degree program" shifted to the University. *Id.*

The Court determined, for two reasons, that BU had failed to meet its burden at trial of demonstrating why it should not have to accommodate plaintiffs' request. First, BU's president, defendant Jon Westling, had been substantially motivated by uninformed stereotypes (as reflected in the "Somnolent Samantha" metaphor) when he made the decision to deny the request. Second, President Westling did not engage in any form of "reasoned deliberation as to whether modifications would change the essential academic standards of [the College's] liberal arts curriculum." *Guckenberger II,* 974 F.Supp. at 149. The Court's conclusion was directly guided by two opinions of the First Circuit in *Wynne v. Tufts University School of Medicine,* which concerned a request for reasonable accommodations by a learning disabled medical student with dyslexia who challenged the multiple choice format of medical school examinations. *See* 932 F.2d 19 (1st Cir.1991) (en banc) (*"Wynne I"*); 976 F.2d 791 (1st Cir.1992) (*"Wynne II"*).

Because of BU's failure to "undertake a diligent assessment of the available options," *Guckenberger II,* 974 F.Supp. at 149 (quoting *Wynne II,* 976 F.2d at 795), the Court ordered BU:

> to propose, within 30 days of the receipt of this order, a deliberative procedure for considering whether modification of its degree requirement in foreign language

---

**1.** *Guckenberger I* is the Court's memorandum and order on defendants' motion to dismiss and plaintiffs' motion for class certification. *See* 957 F.Supp. 306 (D.Mass.1997).

would fundamentally alter the nature of its liberal arts program. Such a procedure shall include a faculty committee set up by the College of Arts and Sciences to examine its degree requirements and to determine whether a course substitution in foreign languages would fundamentally alter the nature of the liberal arts program. The faculty's determination will be subject to the approval of the president, as university by-laws provide. As provided in *Wynne*, BU shall report back to the Court by the end of the semester concerning its decision and the reasons.

*Id.* at 154–55.

## B. *BU's Deliberative Procedure*

The Court considers the following facts to be undisputed. *See Wynne I*, 932 F.2d at 26.

On October 6, 1997, the Court approved the use of the existing Dean's Advisory Committee (the "Committee") of the College as the mechanism for deliberating the issue of course substitutions for the foreign language requirement in accordance with the Court's order. In the course of normal business, the Committee "is charged by the by-laws of the College with advising the Dean on issues involving academic standards." (Berkey Dec. 18 Aff. ¶ 4.) During the relevant time period, the Committee was composed of eleven faculty members of the College, including professors of mathematics, English, philosophy, natural sciences, engineering and foreign languages.[2] The Committee is normally chaired by Dennis D. Berkey, who is the Dean of the College and the Provost of BU. However, Dean Berkey removed himself as chairman of proceedings relating to course substitutions because of his role in the "central administration" of BU. (*Id.* ¶ 10.) In his place, Associate Professor of Mathematics Paul Blanchard assumed the role of Acting Chairman. (*Id.*)

The Committee convened to consider the issue of course substitutions on seven occasions.[3] In keeping with its practice for general business, the Committee meetings were closed to interested parties and the public, with two exceptions. The first meeting on this issue was attended by Attorneys Lawrence Elswit and Erika Geetter, counsel for BU, who "set out the Committee's responsibilities as outlined in the Court's decision." (*Id.* ¶ 10.) Also, several College students addressed the Committee at the November 14, 1997 meeting. Their involvement was directed by the Court at a October 6, 1997 hearing and was solicited through notice posted on an internet bulletin board and an advertisement published in BU's student newspaper, *The Daily Free Press*, on October 27, October 29 and November 3. (*Id.* ¶ 7.) The opportunity for student input was also reported on the second page of a front-page story in the October 24 issue of *The Daily Free Press*. (*Id.* Ex.) Only current College students were permitted to address the Committee, and only five students did so. Among the students who spoke was Catherine Hays Miller, who had testified at trial. Neither President Westling nor his direct staff had any involvement with the Committee proceedings, and the Committee did not officially seek any other input from non-members.

The Committee kept minutes of four of its seven meetings. No minutes were recorded during the first two meetings, but, following the Court's order to do so at the October 6 hearing, minutes were kept for all but the last of the remaining meetings. The minutes are topical summaries of the discussions that took place at the covered meetings. They do not identify speakers. The Committee had

---

**2.** The members of the Committee during the relevant period were: Dennis D. Berkey, Provost of BU, Dean of the College and Prof. of Mathematics; Paul Blanchard, Assoc. Prof. of Mathematics and Acting Chair of the Committee; Gail A. Carpenter, Prof. of Mathematics and Cognitive & Neural Systems; Charles L. Griswold, Jr., Prof. of Philosophy; Julie M. Hansen, Chair of Archaeology Dep't; Susan K. Jackson, Assoc. Dean of the College and Assoc. Prof. of French and 1993 winner of "Outstanding Professor," Learning Disabilities Support Services; Dorothy Kelly, Chair of Modern Language Literature Dep't; Michael Mendillo, Prof. of Astronomy and of Electrical and Computer Engineering; Carol Simpson, Chair of Earth Sciences Dep't; William L. Vance, Prof. of English; and J. Scott Whitaker, Prof. of Physics.

**3.** The meetings occurred on the following dates in 1997: September 17 and 26; October 8, 15 and 29; and November 14 and 20.

never before kept minutes in the course of normal business.

On December 2, 1997, the Committee completed its eight-page report (plus attachments) and submitted it to President Westling in accordance with the BU by-laws. (Berkey Feb. 19 Aff. ¶ 3 & Ex.) Its final recommendation was:

> After extensive review and deliberation, the [Committee's] professional and academic judgment is that the conjunction of the foregoing considerations (which we have merely summarized here) entails but one conclusion: the foreign language requirement is fundamental to the nature of the liberal arts degree at Boston University. The [Committee] therefore recommends against approving course substitutions for any student as an alternative to fulfilling the foreign language requirement.

(*Id.* Ex.) Two days later, President Westling, in a letter to Dean Berkey, accepted the recommendation of the Committee. (*Id.* ¶ 4 & Ex.) The completed report, along with minutes and attachments, was filed with the Court on December 5, 1997 and refiled as an attachment to an affidavit of Dean Berkey on February 19, 1998.

### DISCUSSION

#### A. *The Test*

■ The First Circuit crafted the following test for evaluating the decision of an academic institution with respect to the availability of reasonable accommodations for the learning disabled:

> If the institution submits undisputed facts demonstrating that the relevant officials within the institution considered alternative means, their feasibility, cost and effect on the academic program, and came to a rationally justifiable conclusion that the available alternatives would result either in lowering academic standards or requiring substantial program alteration, the court could rule as a matter of law that the institution had met its duty of seeking reasonable accommodation.

*Wynne I*, 932 F.2d at 26, *quoted in Guckenberger II*, 974 F.Supp. at 148. "[T]he point is not whether a [university] is 'right' or 'wrong'

in making program-related decisions. Such absolutes rarely apply in the context of subjective decisionmaking, particularly in a scholastic setting." *Wynne II*, 976 F.2d at 795.

#### B. *Basic Facts Showing Reasoned Deliberation*

■ The Court's first task under this test is "to find the basic facts, giving due deference to the school . . . ." *Wynne I*, 932 F.2d at 27. Those "basic facts" must include showings of the following: (1) an "indication of who took part in the decision [and] when it was made;" (2) a "discussion of the unique qualities" of the foreign language requirement as it now stands; and (3) "a consideration of possible alternatives" to the requirement. *Id.* at 28. As these elements suggest, the required showing of undisputed facts refers to the "consideration" of the request by BU and not, as plaintiffs suggest, to a broad-ranging consensus of expert or university opinion on the value of foreign languages to a liberal arts curriculum.

■ The Court concludes that BU has presented sufficient undisputed essential facts, satisfying each of the three aspects of *Wynne*'s requirements. First, the Committee, made up of eminent members of the College faculty, deliberated this issue over the course of two months. The eleven Committee members include four department chairmen and represent diverse disciplines beyond the foreign languages. Though it would have been better to have kept minutes of all seven meetings, the four meetings provide the Court with sufficient insight to allow the Court to review the procedure that BU followed and to "demythologize[ ] the institutional thought processes . . . ." *Wynne II*, 976 F.2d at 795. BU took pains to insulate President Westling from the process to remove any concerns about his earlier comments which, in substantial part, necessitated this remedy. The Committee gave adequate notice to College students, both with and without learning disabilities, of the opportunity to provide input into the Committee's decision. The Committee's reliance on only its own academic judgment and the input of College

students was reasonable and in keeping with the nature of the decision.[4]

Second, the Committee had vigorous discussions of the "unique qualities" of the foreign language requirement and its importance to the liberal arts curriculum. *Id.* at 794. Its members rallied around an articulated defense, highlighted throughout the Report, of the rigorous foreign language requirement of the College. In both the Minutes and the Report, the Committee mentioned technical educational gains from the learning of foreign languages, such as enhancing an ability to read foreign literature in its original form and laying a "foundation" for other areas of academic concentration. (*See, e.g.*, Report at 3–4.) For example, some members at the October 8 meeting believed it was important to be immersed in ancient Greek and Latin to understand Greek and Roman cultures. Another Committee member waxed "that someone who can read in French would realize that Madame Bovary dies in the imperfect tense, something we don't have in the English language, and it makes for a very different understanding of the novel."

Additionally, the Committee repeatedly emphasized its view that foreign language study uniquely contributed to the College's emphasis on multiculturalism: "A mind cooped up within a single culture is not liberally educated, and knowledge of a foreign language is essential to countering parochialism of outlook and knowledge." (*Id.* at 4.) The Committee also portrayed foreign language study as part of a broader liberal arts education which, in its view, contemplates "some competence in thinking in diverse areas of knowledge." (*Id.*) Commenting on the specific contribution of foreign language learning to liberal arts, the Committee reported that "[e]ncountering a foreign culture in and through the complexities of its verbal structures and representations poses a unique challenge to familiar idioms, settled habits of mind, and securities of knowledge." (*Id.* at 8.)

Third, the Committee "explained what thought it had given to different methods" of meeting the requirement and "why it eschewed alternatives" to meeting the requirement. *Wynne II*, 976 F.2d at 794. The minutes indicate that alternatives were discussed in at least four of the Committee's meetings. The Report discusses objections to the Committee's conclusion. One dissenting member suggested an alternative proposal whereby a "student would select courses from a faculty approved list that focus on the language, culture, history, literature, and art of countries where the language is spoken." (Report at 8.) However, "[n]o other member shared this belief that the goals of foreign language study could be met by 'alternative paths' outside the foreign languages." (*Id.*) Additionally, the objections of several students were noted at length. (*See id.* at 6–7; Nov. 14 Meeting Minutes.)

As a whole, the Committee concluded that "[n]o content course taught in English can substitute fully for the insider access to other cultures—with its attendant invitation to thoroughgoing critical self-awareness—that is the hallmark of foreign language study." (Report at 8.) The Committee acknowledged that some students, both learning disabled and not, will "struggle" with the rigorous requirement, but nonetheless concluded "that no other goal could serve the same purpose within the [College] curriculum." (*Id.* at 7–8.)

Furthermore, the Committee discussed the College's existing accommodations of learning disabled students attempting to fulfill the foreign language requirement, a consideration that weighs in BU's favor in this analysis. *See Wynne II*, 976 F.2d at 795 (noting with favor Tufts' accommodations of tutoring, taped lectures and untimed examinations). The College allows all its students to satisfy the foreign language requirement in a variety of ways, including a free "Foreign Language Enhancement Program" that provides one-on-one instruction to learning disabled students navigating the required sequences of language classes. (Report at 10–11.)

---

4. For example, the Committee excluded Elizabeth Guckenberger, a named plaintiff and current BU law student, from the meetings because she was not enrolled in the College, which was the only faculty at BU affected by this decision.

Learning disabled students are allowed spelling accommodations in language classes, and student tutoring is provided by the foreign language department at no cost to students. BU provides for additional time on tests, a reading track for French and Spanish, distraction-free testing, distribution of lecture notes in advance, and replacement of written with oral exams.

## C. Professional, Academic Judgment

Having found undisputed facts of a reasoned deliberation, the Court must "evaluate whether those facts add up to a professional, academic judgment that reasonable accommodation is simply not available." *Wynne I,* 932 F.2d at 27–28. In the unique context of academic curricular decision-making, the courts may not override a faculty's professional judgment "unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Id.* at 25 (quoting *Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 225, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985)).

This standard is in keeping with the policy of judicial deference to academic decision making. The Court previously indicated that BU's decision would be given "great deference" so long as it occurred "after reasoned deliberations as to whether modifications would change the essential academic standards of its liberal arts curriculum." *Guckenberger II,* 974 F.Supp. at 149. Such deference is appropriate in this arena, because "[w]hen judges are asked to review the substance of a genuinely academic decision, ... they should show great respect for the faculty's professional judgment." *Wynne I,* 932 F.2d at 25 (quoting *Ewing,* 474 U.S. at 225, 106 S.Ct. 507) (omission in original); *cf. Bercovitch v. Baldwin Sch., Inc.,* 133 F.3d 141, 153 (1st Cir.1998). While, of course, "academic freedom does not embrace the freedom to discriminate," the First Circuit has observed that "[w]e are a society that cherishes academic freedom and recognizes that universities deserve great leeway in their operations." *Cohen v. Brown Univ.,* 101 F.3d 155, 185 (1st Cir.1996) (citations

omitted), *cert. denied,* —— U.S. ——, 117 S.Ct. 1469, 137 L.Ed.2d 682 (1997).

Plaintiffs attack the academic judgment of the Committee in three ways. First, they argue that BU's decision does mark "a substantial departure from accepted academic norms" because a majority of other colleges and universities—including Princeton, Harvard, Yale, Columbia, Dartmouth, Cornell and Brown—either do not have a general foreign language requirement or permit course substitutions for foreign languages. They also point out that the academic program would not be substantially affected because at BU only 15 students (out of 26,000) a semester would require such course modifications and suggest that similar low numbers of students requesting accommodations in other universities inform their willingness to allow substitutions. (*See* Shaw Decl. ¶ 9). The evidence that BU is only among a handful of schools of higher education in its decision to deny course substitutions in language requirements is relevant to an evaluation of its decision to deny a reasonable accommodation. However, a court should not determine that an academic decision is a "substantial departure from accepted academic norms" simply by conducting a head-count of other universities. This approach is particularly inappropriate in the protean area of a liberal arts education. The liberal arts curriculum cannot be fit into a cookie cutter mold, unlike the medical school curriculum in *Wynne,* where no one disputed that mastery of biochemistry was necessary.

The *Wynne* decisions indicate that the appropriate question is whether BU's decision is "rationally justifiable" rather than the only possible conclusion it could have reached or other universities have reached. *See Wynne I,* 932 F.2d at 26. In *Wynne II,* the First Circuit endorsed the professional, academic judgment of Tufts Medical School officials, who had concluded after deliberation that allowing a requested accommodation "would require substantial program alterations, result in lowering academic standards, and devalue Tufts' end product...." *Wynne II,* 976 F.2d at 795; *see also Bercovitch,* 133 F.3d at 154 ("The law does not require an academic program

to compromise its integral criteria to accommodate a disabled individual."). The Court of Appeals there rejected a similar argument that at least one other medical school and a national testing service had permitted oral renderings of multiple-choice examinations. 976 F.2d at 795. Instead, because "Tufts decided, rationally if not inevitably, that no further accommodation could be made without imposing an undue (and injurious) hardship on the academic program," *Wynne II*, 976 F.2d at 795, the First Circuit ruled as a matter of law that the medical school had met its burden under the ADA.

This Court concludes that so long as an academic institution rationally, without pretext, exercises its deliberate professional judgment not to permit course substitutions for an academic requirement in a liberal arts curriculum, the ADA does not authorize the courts to intervene even if a majority of other comparable academic institutions disagree.

Second, plaintiffs challenge the substance of the Committee's conclusions and analysis. Specifically, they argue that there are sixteen "material facts" in dispute, such as the following: (1) the two year (four semester) foreign language requirement is not "sufficient to permit the vast majority of students to read major works of literature in a foreign language," thus debunking the *Madame Bovary* line of argument as involving an imperfect logic, not an imperfect tense; (2) a "foreign language requirement does not provide students with educational benefits regarding a foreign culture;" (3) there is "no particular thinking process involved in learning a foreign language that is distinct from any other type of learning;" and (4) BU's "foreign language requirement does not address ethnocentrism among students."

In particular, Naomi S. Baron, a chair of the Department of Language and Foreign Studies at American University, criticized the foreign language "mystique" on plaintiffs' behalf. Nevertheless, even Professor Baron acknowledges that many academic and governmental institutions in recent years have espoused foreign language requirements, indicating the existence of a genuine academic dispute on this issue. *See* Naomi S. Baron,

*Rationales and Rationalizations in Foreign Language Requirements,* Liberal Educ., Fall 1982, at 181. For example, she cites a study commissioned by then President Carter (*Strength through Wisdom,* 1979) which suggested that foreign language study was in the national interest. *Id.* at 184. Many colleges and universities (like Harvard and Haverford) have required proficiency in foreign languages based on the rationale that they deepen the students' appreciation of their own language, promote mental discipline, improve understanding between languages and thought, and make students less ethnocentric. *Id.* at 186–88. While plaintiffs have submitted affidavits of Professor Baron and other academics who strongly disagree with BU's conclusions and label them as "trite," "idealistic" or "cliches," these issues raise the kinds of academic decisions that universities—not courts—are entrusted with making.

Plaintiffs' final mode of attack is to argue that BU's report does not meet the minimum accepted standards of academic study and inquiry, especially in the Committee's not having referred to outside experts. Prior to the initiation of this litigation, President Westling did not substantially consult experts in learning disabilities or engage in any deliberative process in reaching his decision to preclude course substitutions. In *Guckenberger II*, I held that a decision involving reasonable accommodations must involve more than an *ipse dixit* or blind adherence to the status quo. *See* 974 F.Supp. at 149. However, the Committee's deliberative process occurred after a lengthy trial in which experts in the field of learning disabilities testified about the difficulty which students with learning disabilities experience in their efforts to gain proficiency in a foreign language. This testimony summarized in *Guckenberger II* was available to the members of the Committee. In light of the tight timetable which the litigation imposed on the Committee, and the expert evidence in prior proceedings, I am unpersuaded that further academic study (like a "longitudinal" study) would have refined or altered the decision-making process, which ultimately involved a

qualitative evaluation: What is essential to a liberal arts education?

Plaintiffs' vigorous attacks on BU's submission generally overstate the Court's level of scrutiny at this stage of litigation. My opinion as to the value of foreign languages in a liberal arts curriculum is not material so long as the requirements of *Wynne* have been met. Despite plaintiffs' attempts to pull truly academic policy debates into the courtroom, the facts "essential" to this order are actually undisputed: BU implemented a deliberative procedure by which it considered in a timely manner both the importance of the foreign language requirement to this College and the feasibility of alternatives. Plaintiffs' argument that the procedure should have been more extensive and inclusive—effectively, more like a legal proceeding—does not have any support in the *Wynne* opinions.

BU's deliberations and conclusions pass muster under *Wynne*. The Court has no cause to doubt the academic qualifications and professionalism of the eleven members of the Committee. There is no evidence that the Committee's decision was mere lip service to the Court's order or was tainted by pretext, insincerity, or bad faith, beyond plaintiffs' unsubstantiated speculation that President Westling's bias infected the Committee. *See Wynne II,* 976 F.2d at 796 (placing burden on plaintiffs "to produce specific facts" of pretext). The Report is rationally premised on the Committee's conclusion that the liberal arts degree is "[i]n no sense a technical or vocational degree" like other degrees and that, in its view, the foreign language requirement "has a primarily intellectual, non-utilitarian purpose." (Report at 5.) With the justifiable belief in mind that this decision could not be made empirically, the Committee concluded that "[k]nowledge of a foreign language is one of the keys to opening the door to the classics and so to liberal learning. It is not the only key, but we do judge it as indispensable." (*Id.* at 7.)

The Court concludes that the Committee's judgment that "a person holding a liberal arts degree from Boston University ought to have some experience studying a foreign language," (*id.*), is "rationally justifi-

able" and represents a professional judgment with which the Court should not interfere. Therefore, the Court concludes as a matter of law that BU has not violated its duty to provide reasonable accommodations to learning disabled students under the ADA by refusing to provide course substitutions.

### ORDER

Defendant Boston University has proven that it complied with paragraph two of the Court's order of August 15, 1997. *See Guckenberger v. Boston Univ.,* 974 F.Supp. 106, 154–55 (D.Mass.1997).

### *SO ORDERED.*