USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 97-1704 

 JOHN M. HODGENS,

 Plaintiff, Appellant,

 v.

 GENERAL DYNAMICS CORPORATION,

 Defendant, Appellee.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF RHODE ISLAND

 [Hon. Ernest C. Torres, U.S. District Judge]

 Before

 Torruella, Chief Judge,
 
 Bownes, Senior Circuit Judge,
 
 and Stahl, Circuit Judge.
 
 

 Patricia E. Andrews for appellant.
 Barbara L. Sloan, Attorney, C. Gregory Stewart, General
Counsel, J. Ray Terry, Jr., Deputy General Counsel, Gwendolyn Young
Reams, Associate General Counsel, and Lorraine C. Davis, Assistant
General Counsel, on brief for Equal Employment Opportunity
Commission, amicus curiae.
 Lynette Labinger, Roney & Labinger, Christopher M. Mulhearn,
Tate & Elias on brief for Rhode Island Affiliate American Civil
Liberties Union, amicus curiae.
 Neal J. McNamara for appellee.
 Corrie L. Fischel, Ann Elizabeth Reesman, and McGuiness &
Williams on brief for Equal Employment Advisory Council, amicus
curiae.

 
 
 May 21, 1998
 
 
 
 
 

 BOWNES, Senior Circuit Judge. This is the first time we
have had occasion to construe the Family and Medical Leave Act of
1993 ("FMLA"), 29 U.S.C. 2601-2619 (1994), which established
important rights that protect millions of American employees.
 Plaintiff John Hodgens sued his former employer, General
Dynamics Corporation ("General Dynamics" or "GD"), for allegedly
terminating his employment because he took necessary medical leave
that was protected under the FMLA. His complaint further alleged
that his discharge constituted discrimination based on his
disability (high blood pressure and atrial fibrillation), in
violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C.
 12101-12213 (1994). The district court granted GD's motion for
summary judgment. The court found that Hodgens's leave was not
protected under the FMLA because he did not have a "serious health
condition," as required by the Act. 29 U.S.C. 2612(a)(1)(D). 
And the court rejected his ADA claim on the ground that his medical
condition, after taking account of mitigating treatment, did not
constitute a disability within the meaning of the ADA. 42 U.S.C.
 12102(2)(A). Although we rely on different reasoning, we affirm
the grant of summary judgment.
 Facts
 We recount the facts and draw all reasonable inferences
in the light most favorable to Hodgens, as we must when we review
a grant of summary judgment. See DeNovellis v. Shalala, 124 F.3d
298, 306 (1st Cir. 1997). From 1964 until 1985, Hodgens worked for
General Dynamics at its Quincy, Massachusetts location. The
facility was closed and Hodgens was laid off in 1985. In
approximately February 1988, General Dynamics hired Hodgens as a
Senior Planner at its Quonset Point (R.I.) facility. He worked in
the program planning area until September 1991. 
 His performance was evaluated quite highly during his
years in program planning. GD's evaluation system (as applied to
his positions with the company) consisted of an annual ranking,
covering the period beginning March 1 of one year through the end
of February of the next. Similarly situated employees (in the same
or similar job titles, pay grades, etc.) were placed in "peer" or
"rank" groups and then numerically "ranked" based on performance. 
The employees in a particular rank group were evaluated by all
supervisors of such employees, at a meeting where performance was
discussed and rankings determined by consensus. During the three
years in which Hodgens worked in program planning, he was ranked
first (among four or five) in his peer group.
 In September 1991, the program planning function at
Quonset Point was eliminated and Hodgens was reassigned to the
production control area, where he worked until his termination in
July 1994. Unlike program planning where Hodgens had tracked
costs and performed a data auditing function, not requiring a deep
knowledge of construction procedures production control was
"hands on" work, requiring familiarity with the details of
submarine hull and components manufacturing. Because Hodgens had
not previously done this type of work, he was at a disadvantage
relative to his co-workers who did have such experience. As a
result, Hodgens's performance fell. In 1992, he was ranked eighth
of ten; the employees who ranked ninth and tenth were laid off that
year as part of a reduction in force ("RIF"). In 1993, Hodgens
ranked seventh of eleven in his rank group. Hodgens was concerned
about his performance in production control, and especially worried
about the possibility that his low performance might lead to his
being laid off if there were to be another RIF.
 For his first two years in production control, Hodgens
performed sound dampening functions (a process by which submarines
are soundproofed). He performed this part of his duties in a
satisfactory manner; his last evaluation covering the period 1993-
94 stated that he did an "excellent job in sound dampening." At
some point during this period, however, GD decided to change its
employees' responsibilities from specializing in a particular
function to include all aspects of a project. Hodgens was assigned
to "Module 82," an area on the Seawolf submarine. His duties
included monitoring and facilitating the work on the module,
filling work orders, maintaining proper material flow, and solving
production problems. He worked on Module 82 between April and the
beginning of August 1993. 
 It was during this period that Hodgens began to
experience medical problems, including chest pains, visual
problems, and profuse perspiration. These began in approximately
June or July 1993. On August 4, he began to see his doctor, Dr.
Joanne Wilkinson. She was "most concerned" that his symptoms,
coupled with his history of hypertension (high blood pressure or
HBP), might indicate that he was suffering from angina, which could
be extremely serious or even fatal. She therefore advised Hodgens
to undergo a stress test and an electrocardiogram (EKG). Dr.
Wilkinson continued to see Hodgens on frequent occasions throughout
August, during which time she was unable either to make a diagnosis
or to rule out angina. During some of these visits, Hodgens's
blood pressure was "way up," and Dr. Wilkinson continued to treat
Hodgens as if he had angina.
 During the period of these visits, from August 4 until
September 27, Hodgens did not return to work. According to him,
this was because of his need for numerous visits to Dr. Wilkinson
and other physicians for evaluation and treatment, and because he
wanted to be sure he did not do anything that might aggravate any
potential heart condition. Dr. Wilkinson testified at her
deposition that she thought it was "reasonable" for Hodgens to stay
home from work until he got the results of his stress test,
although, if her patient had wanted to return to work during the
interim, she would have been "comfortable" with that.
 Dr. Wilkinson also treated Hodgens for hypertension,
prescribing a combination of medications, and for acute anxiety
reactions. As part of the treatment for the latter, Dr. Wilkinson
referred Hodgens to a psychologist for counseling to help reduce
his stress. According to Hodgens's testimony, he had never
previously experienced the degree of stress that he experienced in
Module 82. Dr. Wilkinson also referred Hodgens to Dr. Jacobs, an
ophthalmologist, because of his visual problems. Dr. Jacobs
determined that he was suffering from migraine auras.
 On September 13, 1993, Dr. Wilkinson told Hodgens that
the results of his EKG, MRI and stress test were normal. She was
able to rule out a stroke or a serious neurological problem, but
she was still unable to rule out the possibility of angina. 
Nevertheless, she cleared Hodgens to return to work as of September
20. He did not return on that day, however, because he felt ill in
his car and had to return home. He did return to work on September
21. As a matter of General Dynamics policy, GD's company nurse had
to examine any employee, such as Hodgens, who had been out of work
for more than five days because of illness. During her
examination, the nurse detected that Hodgens was experiencing
atrial fibrillation (irregular heartbeat) and that his blood
pressure was elevated. She therefore refused to allow him to
return to work and suggested that he see his doctor immediately.
 Hodgens did so, and Dr. Wilkinson diagnosed him as
suffering from atrial fibrillation, a serious and potentially life-
threatening heart condition. After treating him, by prescribing
medication to thin his blood in order to prevent a stroke, Dr.
Wilkinson told Hodgens he could return to work on September 27. 
She restricted him to working half-days during the first week, and
to working a light-duty schedule for the following three weeks.
 Hodgens returned to work on September 27. General
Dynamics changed his assignment so that he was no longer part of a
module; according to GD, Module 82 was nearing completion. 
Instead, until December 1993, Hodgens was assigned exclusively to
performing sound dampening tasks.
 Shortly thereafter, Hodgens had to take additional
intermittent medical leave to deal with an ear problem. His
hearing problem manifested itself on September 29, 1993, and he saw
a physician six times in three months. On January 7, 1994, he had
ear surgery on an outpatient basis. The surgery left him dizzy and
fatigued; in order to recuperate, he required medication and bed
rest for several days. He returned to work on January 11. In
February, he was assigned to the machine shop (GD says this was in
March). Here, his duties were, according to Hodgens, "low-level,
demeaning, and not the type normally performed by Senior Planners." 
He was no longer performing sound dampening duties. Instead,
another employee was assigned to those duties, an employee who
Hodgens claims was less experienced and less qualified to perform
them.
 In April 1994, Hodgens asked his new supervisor for
vacation leave to handle a family emergency. His supervisor
responded that he was taking "too much time off," and issued a
verbal warning about his attendance. 
 On May 10, Hodgens met with his former supervisor, and
received his annual evaluation covering the period March 1993
through February 1994. The evaluation contained the statement: 
"Make every effort to have your absenteeism fall within the company
guidelines."
 At the same May 10 meeting, the supervisor told him he
was being laid off for lack of work, effective July 8, 1994. His
performance had been ranked seventh among seven members of his rank
group for the year ending February 1994. 
 Hodgens brought suit in district court, alleging that his
termination violated the FMLA because it was an adverse action
taken on the basis of his having availed himself of protected
leave. He also alleged that it violated the ADA because it was
based on his disabilities. General Dynamics filed a motion for
summary judgment, contending that Hodgens failed to establish a
prima facie case under the FMLA because he did not suffer from a
"serious health condition." GD also argued that Hodgens is not
protected by the ADA because his conditions did not constitute a
"disability." The district court granted GD's motion. According
to the court, "an employee's absence [from work] must be necessary
to enable the employee to receive treatment. If an employee can
obtain treatment without missing work, any period of absence cannot
be attributed to the need to receive treatment." As for the ADA,
the court held that, taking into account the ameliorative effects
of Hodgens's medications, his medical conditions did not constitute
a disability under the ADA.
 I
 We review grants of summary judgment de novo. Dubois v.
United States Dep't of Agric., 102 F.3d 1273, 1283 (1st Cir. 1996),
cert. denied, 117 S. Ct. 2510 (1997). Summary judgment is
appropriate when "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a judgment
as a matter of law." Fed. R. Civ. P. 56(c).
 "'The very mission of the summary judgment procedure is
to pierce the pleadings and to assess the proof in order to see
whether there is a genuine need for trial.'" DeNovellis, 124 F.3d
at 305-6 (quoting Fed. R. Civ. P. 56(e) advisory committee's note
to 1963 Amendment). The moving party "bears the initial
responsibility of informing the district court of the basis for its
motion, and identifying those portions of [the record] which it
believes demonstrate the absence of a genuine issue of material
fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once
the moving party has properly supported its motion for summary
judgment, the burden shifts to the nonmoving party, with respect to
each issue on which he has the burden of proof, to demonstrate that
a trier of fact reasonably could find in his favor. Id. at 322-25. 
At this stage, the nonmoving party "may not rest upon mere
allegation or denials of [the movant's] pleading, but must set
forth specific facts showing that there is a genuine issue" of
material fact as to each issue upon which he would bear the
ultimate burden of proof at trial. Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 256 (1986); see Celotex, 477 U.S. at 321-23. 
 II
 Because our circuit has not previously had occasion to
consider the Family and Medical Leave Act of 1993, we set forth
some background at the outset. "The FMLA was enacted to help
working men and women balance the conflicting demands of work and
personal life. It does so by recognizing that there will be times
in a person's life when that person is incapable of performing her
duties for medical reasons." Price v. City of Fort Wayne, 117 F.3d
1022, 1024 (7th Cir. 1997).
 The twin purposes of the FMLA are to "balance the demands
of the workplace with the needs of families" and "to entitle
employees to take reasonable leave for medical reasons." 29 U.S.C.
 2601(b)(1) & (2). Among the findings prompting the Act was
Congress's belief that "there is inadequate job security for
employees who have serious health conditions that prevent them from
working for temporary periods." 29 U.S.C. 2601(a)(4). The FMLA
seeks to accomplish its purposes "in a manner that accommodates the
legitimate interests of employers." 29 U.S.C. 2601(b)(3).
 The FMLA contains two distinct types of provisions. 
First, it creates a series of substantive rights. Eligible
employees "shall be entitled" to up to twelve weeks of unpaid leave
per year for any one of the following purposes: when the employee
has "a serious health condition that makes [him or her] unable to
perform the functions of [his or her] position," 29 U.S.C. 
2612(a)(1)(D); to care for a close family member with such a
condition, 29 U.S.C. 2612(a)(1)(C); or because of the birth,
adoption, or placement in foster care of a child, 29 U.S.C. 
2612(a)(1)(A) & (B). See also 29 U.S.C. 2611(11); 29 C.F.R. 
825.100(a), 825.114 (1997) (defining a "serious health condition"). 
Following a qualified absence, the employee is entitled to return
to the same position or an alternate position with equivalent pay,
benefits, and working conditions, and without loss of accrued
seniority. 29 U.S.C. 2614(a)(1); 29 C.F.R. 825.100(c) (1997). 
The FMLA also provides for "intermittent" leave, which allows an
employee to take such leave intermittently "when medically
necessary," such as to attend appointments with a health care
provider for necessary treatment of a serious health condition. 29
U.S.C. 2612(b); 29 C.F.R. 825.117 (1997) (defining requirements
for intermittent leave).
 These rights are essentially prescriptive, "set[ting]
substantive floors" for conduct by employers, and creating
"entitlements" for employees. Diaz v. Fort Wayne Foundry Corp.,
131 F.3d 711, 712-13 (7th Cir. 1997). As to these rights,
therefore, the employee need not show that the employer treated
other employees less favorably, and an employer may not defend its
interference with the FMLA's substantive rights on the ground that
it treats all employees equally poorly without discriminating. Id.at 712. In such cases, the employer's subjective intent is not
relevant. The issue is simply whether the employer provided its
employee the entitlements set forth in the FMLA for example, a
twelve-week leave or reinstatement after taking a medical leave. 
Because the issue is the right to an entitlement, the employee is
due the benefit if the statutory requirements are satisfied,
regardless of the intent of the employer.
 In addition to creating the above entitlements, the FMLA
provides protection in the event an employee is discriminated
against for exercising those rights. See 29 U.S.C. 2615(a)(1)
& (2); 29 C.F.R. 825.220 (1997). In particular, "[a]n employer
is prohibited from discriminating against employees . . . who have
used FMLA leave." 29 C.F.R. 220(c). Nor may employers "use the
taking of FMLA leave as a negative factor in employment actions,
such as hiring, promotions or disciplinary actions." 29 C.F.R.
 825.220(c). For any such violation, the employer is subject to
a claim for compensatory damages and, unless the court finds the
violation occurred in good faith, additional liquidated damages. 
29 U.S.C. 2617(a)(1)(A). These provisions are essentially
proscriptive.
 It is this proscriptive group of violations of the Act
that is at issue in the present case. Hodgens claims that his
termination violated the FMLA because it was prompted by the fact
that he took sick leave to which he was entitled under the statute. 
In such a case, the employer's motive is relevant, and the issue is
whether the employer took the adverse action because of a
prohibited reason or for a legitimate nondiscriminatory reason. 
Such issues are analogous to those raised in cases involving other
types of discrimination, such as Title VII of the Civil Rights Act
of 1964, 42 U.S.C. 2000e through 2000e-17. In such cases, courts
have created a framework for analyzing the tricky issue of
motivation. See McDonnell Douglas Corp. v. Green, 411 U.S. 792,
800-06 (1973) (discrimination under Title VII); DeNovellis, 124
F.3d at 308 (under ADEA); Katz v. City Metal Co., 87 F.3d 26, 30
n.2 (1st Cir. 1996) (under ADA). Some of our sister circuit courts
have applied this framework to the proscriptive portion of the
FMLA, but not to claims under the prescriptive portion of the Act. 
See, e.g., Diaz, 131 F.3d at 712-13; Morgan v. Hilti, Inc., 108
F.3d 1319, 1323 (10th Cir. 1997). We follow that lead and hold
that, when there is no direct evidence of discrimination, the
McDonnell Douglas burden-shifting framework applies to claims that
an employee was discriminated against for availing himself of FMLA-
protected rights. 
 McDonnell Douglas allocates the burdens of production and
persuasion in accordance with a three-step procedure. SeeMcDonnell Douglas, 411 U.S. at 802-04. Under that framework, a
plaintiff employee must carry the initial burden of coming forward
with sufficient evidence to establish a prima facie case of
discrimination or retaliation. McDonnell Douglas, 411 U.S. at 802;
see Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-
53 (1981). If he does so, then the burden shifts to the employer
"to articulate some legitimate, nondiscriminatory reason for the
employee's [termination]," sufficient to raise a genuine issue of
fact as to whether it discriminated against the employee. 
McDonnell Douglas, 411 U.S. at 802; see Burdine, 450 U.S. at 253. 
The employer "must clearly set forth, through the introduction of
admissible evidence, the reasons for the [employee's termination]. 
The explanation provided must be legally sufficient to justify a
judgment for the [employer]." Burdine, 450 U.S. at 255. If the
employer's evidence creates a genuine issue of fact, the
presumption of discrimination drops from the case, and the
plaintiff retains the ultimate burden of showing that the
employer's stated reason for terminating him was in fact a pretext
for retaliating against him for having taken protected FMLA leave. 
McDonnell Douglas at 804; Burdine, 450 U.S. at 257; St. Mary's
Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993). While a
satisfactory evidentiary explanation by the employer for its
actions destroys the legally mandatory inference of discrimination
arising from the employee's prima facie case, the evidence and
inferences that properly can be drawn from the evidence presented
during the employee's prima facie case may be considered in
determining whether the employer's explanation is pretextual. 
Hicks, 509 U.S. at 511; see also infra at 36-38 (discussing various
ways in which the employee might meet his burden of demonstrating
pretext).
 To make out a prima facie case of retaliation, Hodgens
must show that (1) he availed himself of a protected right under
the FMLA; (2) he was adversely affected by an employment decision;
(3) there is a causal connection between the employee's protected
activity and the employer's adverse employment action. SeeRandlett v. Shalala, 118 F.3d 857, 862 (1st Cir. 1997); Hilti,
Inc., 108 F.3d at 1324. 
 III
 We will follow McDonnell Douglas's three-step process in
analyzing Hodgens's claim that his termination violated the FMLA
because it was prompted by the fact that he took sick leave to
which he was entitled under the statute. The first step in our
analysis is to determine whether Hodgens has satisfied all three
elements of his prima facie case. There is no dispute as to the
second element: his termination was an adverse action. General
Dynamics disputes the first and third elements of Hodgens's prima
facie case.
 A
 General Dynamics asserts that Hodgens has failed to
satisfy the first element of his prima facie case. It contends
that his absences were not protected by the FMLA for two
alternative reasons.
 1
 First, according to GD, Hodgens was not even entitled to
medical leave under the FMLA because he did not suffer from a
"serious health condition" as the statute requires. The district
court granted summary judgment to General Dynamics largely on this
basis. For the reasons set forth below, we hold that Hodgens did
suffer from a "serious health condition" within the meaning of the
FMLA. 
 The FMLA entitles an employee to twelve workweeks of
leave during any twelve-month period "[b]ecause of a serious health
condition that makes the employee unable to perform the functions
of the position of such employee." 29 U.S.C. 2612(a)(1)(D). The
Act defines a "serious health condition" as 
 an illness, injury, impairment, or physical or
 mental condition that involves:

 (A) inpatient care in a hospital, hospice, or
 residential medical care facility; or

 (B) continuing treatment by a health care
 provider.

29 U.S.C. 2611(11). Hodgens does not argue that he received any
inpatient care for his condition; thus, 2611(11)(A) does not
apply. He does, however, contend that his visits to Dr. Wilkinson
constituted "continuing treatment by a health care provider." 
 Under the applicable Department of Labor regulations,

 825.114 (a) For purposes of FMLA, "serious
 health condition" means an illness, injury,
 impairment, or physical or mental condition
 that involves:

 . . .

 (2) Any period of incapacity requiring
 absence from work, school, or other regular
 daily activities, of more than three calendar
 days, that also involves continuing treatment
 by (or under the supervision of) a health care
 provider; or

 (3) Continuing treatment by (or under
 the supervision of) a health care provider for
 a chronic or long-term health condition that
 is incurable or so serious that, if not
 treated, would likely result in a period of
 incapacity of more than three calendar days;
 or for prenatal care.

 (b) "Continuing treatment by a health care
 provider" means one or more of the following:

 (1) The employee or family member in
 question is treated two or more times for the
 injury or illness by a health care provider. 
 Normally this would require visits to the
 health care provider or to a nurse or
 physician's assistant under direct supervision
 of the health care provider.

 (2) The employee or family member is
 treated for the injury or illness two or more
 times by a provider of health care services
 (e.g., physical therapist) under orders of, or
 on referral by, a health care provider, or is
 treated for the injury or illness by a health
 care provider on at least one occasion which
 results in a regimen of continuing treatment
 under the supervision of the health care
 provider for example, a course of medication
 or therapy to resolve the health condition.

 (3) The employee or family member is
 under the continuing supervision of, but not
 necessarily being actively treated by, a
 health care provider due to a serious long-
 term or chronic condition or disability which
 cannot be cured. Examples include persons
 with Alzheimer's, persons who have suffered a
 severe stroke, or persons in the terminal
 stages of a disease who may not be receiving
 active medical treatment.

29 C.F.R. 825.114(a) & (b) (1993). 
 Hodgens suffered from numerous symptoms in July and
August 1993. Dr. Wilkinson examined him and, concerned about
angina and its serious implications, ordered a series of tests
directed toward diagnosing the cause and nature of his problem,
with a view toward prescribing treatment (which she eventually did,
although she never was able to rule out angina). Then between
September 22 and 27, Hodgens was diagnosed with atrial
fibrillation, and again was required to make many visits to Dr.
Wilkinson's office. This latter period constituted more than three
consecutive days' worth of absences from work for a serious health
condition. And these absences were medically necessary: Hodgens's
treating physician, Dr. Wilkinson, filled out a work-restriction
form at the top of which appeared the date September 22 stating
September 27 as the date on which Hodgens could return to work. 
Dr. Wilkinson's form carries the inference that that entire period
of absence was medically necessary, and GD nowhere rebuts that
inference. Indeed, on September 21, GD's own nurse refused to let
Hodgens return to work at least in part because of his atrial
fibrillation. Thus, we cannot accept GD's claim, based on Dr.
Wilkinson's initially clearing Hodgens to return to work on
September 20, that Hodgens's health condition did not prevent him
from working within the meaning of the FMLA during the period
September 22-27. 
 At least the September 22-27 diagnosis and treatment
program met the three day requirement of 29 C.F.R. 825.114(a)(2)
(1993), as long as there was continuing treatment under
 825.114(b). Hodgens clearly satisfied the requirements of
 825.114(b)(1), at least sufficient to satisfy summary judgment,
because he had two or more treatments by a health care provider. 
He also fits within 825.114(b)(2) because he had seen a physician
at least once and been placed on a treatment regimen of medication. 
See Price v. Marathon Cheese Corp., 119 F.3d 330, 335 (5th Cir.
1997). 
 General Dynamics argues that many of Hodgens's earlier
absences were not covered by the FMLA because "Dr. Wilkinson was
never able to diagnose precisely what caused [Hodgens's] symptoms." 
Def. Br. at 22. It seems unlikely that Congress intended to punish
people who are unlucky enough to develop new diseases, or to suffer
serious symptoms for some period of time before the medical
profession is able to diagnose the cause of the problem. Indeed,
one reason for taking "intermittent leave" under the FMLA would be
to visit the doctor for purposes of diagnosis and treatment, even
if the employee does not take leave for the periods in between such
visits. It would seem that Congress intended to include visits to
a doctor when the employee has symptoms that are eventually
diagnosed as constituting a serious health condition, even if, at
the time of the initial medical appointments, the illness has not
yet been diagnosed nor its degree of seriousness determined. The
Labor Department's final regulations support this interpretation: 
"Treatment for purposes of paragraph (a) of this section [defining
'serious health condition' in terms of 'treatment' received, inter
alia] includes (but is not limited to) examinations to determine if
a serious health condition exists and evaluations of the
condition." 29 C.F.R. 825.114(b) (1997) (emphasis added). Thus,
as long as Hodgens satisfied, at some point in time, the "more than
three consecutive days" requirement for establishing a serious
health condition, his intermittent absences for less than four days
(even for portions of one day) were protected under the FMLA if
they were necessary "to determine if a serious health condition
exists," id., or to treat such a condition. This is true even if
the intermittent absences occurred before the consecutive absences.
 In addition to 825.114(a)(2), Hodgens fits within
 825.114(a)(3). If not treated, Hodgens's illness could have led
to a lot more absences from work, or could even have proved fatal,
thus bringing him within the ambit of 825.114(a)(3). Subsection
(a)(3) also requires him to meet the definition of continuing
treatment under one of the subsections of 825.114(b). As noted
supra, he clearly satisfied the requirements of subsections (b)(1)
and (b)(2), at least sufficient to survive summary judgment. With
all inferences taken in his favor, the issue is trialworthy, i.e.,
a trier of fact could find that he met all statutory requirements
to show that he did suffer from a "serious health condition," and
so his medically necessary leave was protected by the FMLA to the
extent it was necessitated by that condition.
 2
 The district court's alternative reason for rejecting
Hodgens's FMLA claim is that "there is no evidence that [his
health] condition rendered him unable to perform the functions of
his position," as required in 29 U.S.C. 2612(a)(1)(D). The court
therefore concluded that his absences were not protected conduct
under the FMLA. We reject this contention as well. The court
apparently read the statute to require Hodgens to be actually
incapacitated, in the sense of medically too sick to work, for any
absence that was to be protected by the FMLA.
 We disagree. The statutory language "unable to
perform" his job in 29 U.S.C. 2612(a)(1)(D) does not
necessarily mean that an employee's physical condition itself
"actually incapacitate[s]" him and prevents him from working. The
statute could also be read to protect absences from work for
whatever time the employee needs in order to be diagnosed and
treated for a serious medical condition. Under this reading of the
statutory language, the employee may be found to be "unable to
perform" his job if his medical appointments conflict with his work
(and the other statutory requirements are met), even if he is not
"too sick to work." The text of the statute does not specify which
of these two interpretations of "unable to perform" (or any other)
was intended by Congress.
 In determining which interpretation to adopt, we must
consider the fact that the FMLA is a remedial statute. Cf. Arnoldv. United Parcel Serv., Inc., 136 F.3d 854, 861 (1st Cir. 1998)
(interpreting the Americans with Disabilities Act). "It is a
'familiar canon of statutory construction that remedial
legislation,'" such as the FMLA, "should be construed broadly to
effectuate its purposes.'" Id. (quoting Tcherepnin v. Knight, 389
U.S. 332, 336 (1967)). The fundamental purpose of the FMLA is "to
entitle employees to take reasonable leave for medical reasons," 29
U.S.C. 2601(b)(2), "to help working men and women balance the
conflicting demands of work and personal life," City of Fort Wayne,
117 F.3d at 1024. This purpose is better served by adopting the
broader reading than by adopting the district court's more
constrained construction requiring physical incapacitation. We
hold that it will suffice if an employee is "unable to perform" his
job because of the need to obtain medical treatment or a diagnosis;
he does not have to be physically unable to work. 
 The legislative history of the FMLA supports this
reading. 
 The requirement that the employee be unable to
 perform his or her job functions does not mean
 in each instance that the employee must
 literally be so physically and mentally
 incapacitated that he or she is generally
 unable to work. . . . [I]f the employee must
 be physically absent from work from time to
 time in order to receive the treatment, it
 follows as a matter of common sense that the
 employee is, during the time of the
 treatments, temporarily "unable to perform the
 functions of his or her position" for purposes
 of [ 2612(a)(1)(D)] and therefore eligible
 for leave for the time necessary to receive
 the treatments.

S. Rep. No. 103-3, pt. 1, at 25 (1993), reprinted in 1993
U.S.C.C.A.N. 3, 27 (emphasis added); see id. at 29, 1993
U.S.C.C.A.N. at 31 (noting the "general test that either the
underlying health condition or the treatment for it requires that
the employee be absent from work on a recurring basis or for more
than a few days for treatment or recovery" (emphasis added)).
 Our interpretation is further buttressed by the
Department of Labor's final regulations. The final version of 29
C.F.R. 825.114(a) (1997), like the corresponding interim
regulation, defines "serious health condition" as involving
(1) inpatient care or (2) continuing treatment. Under the rubric
of continuing treatment, the regulation describes "incapacity" as
"inability to work . . . due to the serious health condition,
treatment therefor, or recovery therefrom." 29 C.F.R.
 825.114(a)(2)(i) (emphasis added). In a similar vein, 29 C.F.R.
 825.114(b) (1997) reads as follows: "Treatment for purposes of
paragraph (a) of this section [defining 'serious health condition'
in terms of 'treatment' received, inter alia] includes (but is not
limited to) examinations to determine if a serious health condition
exists and evaluations of the condition" (emphasis added). See
also 29 C.F.R. 825.115 (1997) ("An employee who must be absent
from work to receive medical treatment for a serious health
condition is considered to be unable to perform the essential
functions of the position during the absence for treatment.").
 It is thus apparent that the agency charged with
interpreting the FMLA and filling in any gaps or ambiguities in
the Act believed that the Act should be interpreted broadly
enough to protect absences from work that are necessary for the
purpose of having one's medical condition diagnosed and treated,
such as those at issue here. The agency did not interpret the
statutory language that Hodgens's health condition render him
"unable to perform" his work as requiring him to be "too sick to
work." The agency's interpretation is entitled to deference. SeeChevron, 467 U.S. at 843-44. We hold that Hodgens's absences from
work were protected by the FMLA if they were required for the
diagnosis and treatment of his medical condition, as long as he
satisfied the other requirements for "seriousness"; it is not
necessary that the medical condition make him "too sick to work" on
a particular day in order for an absence on that day to be covered
under the statute. We therefore reverse the district court's
holding to the extent that it stated a contrary view. The FMLA
protected Hodgens's absences whenever his health condition required
him to visit his physician rendering him unable to work during the
time it took to accomplish those visits.
 We conclude that Hodgens would be entitled to survive
summary judgment if a rational trier of fact could find that at
least four consecutive days' worth of Hodgens's absences were
medically necessary and therefore rendered him "unable to perform"
his job, within the meaning of 29 U.S.C. 2612(a)(1)(D), for those
days. Because a rational juror could so find, we hold that at
least some of his leave was covered by the FMLA. Therefore the
district court erred to the extent that it predicated its grant of
summary judgment on the ground that there was no FMLA-qualifying
leave at issue.
 B
 Thus far, we have found that, at the summary judgment
stage, Hodgens has satisfied the first element of his prima facie
case, by availing himself of a protected right under the FMLA,
because at least some of the leave Hodgens took during 1993 and
1994 was FMLA-related. Nevertheless, GD argues that most of
Hodgens's absences were not in fact protected leave under the FMLA,
and that it was these non-FMLA absences that motivated it to
evaluate Hodgens unfavorably, plus the quality of his performance
relative to his peers. 
 This argument goes to the third element of Hodgens's
prima facie case: whether he has made a sufficient showing of a
causal connection between his taking FMLA-protected leave and GD's
decision to include him in its RIF and therefore to terminate his
employment. 
 GD admits that Hodgens's supervisor warned him that he
was taking "too much time off," and that this warning came shortly
after Hodgens had taken several days off for ear surgery. GD also
concedes that its evaluation of Hodgens one month later advised him
to "make every effort to have [his] absenteeism fall within company
guidelines." Additionally, during its April 1994 RIF, GD decided
which employees to lay off based on a ranking that considered
Hodgens's absentee rate, as well as his performance during prior
time periods and that performance was diminished in part due to
Hodgens's absences, some of which were FMLA-protected visits to Dr.
Wilkinson regarding his heart condition. This is sufficient to
make out a prima facie case that Hodgens's absences were at least
one factor in his low performance evaluation and hence in his
dismissal.
 The prima facie burden is "quite easy to meet." 
Villanueva v. Wellesley College, 930 F.2d 124, 127 (1st Cir. 1991);
see Burdine, 450 U.S. at 253. Therefore, for purposes of this
summary judgment motion where all inferences are drawn in
Hodgens's favor and in light of the relatively low threshold
showing necessary to establish a prima facie case, we conclude that
Hodgens has satisfied his burden as to the third element (causal
connection), as well as the other elements of his prima facie case.
 IV
 Having disposed of the challenge to the first step of the
McDonnell Douglas analysis (Hodgens's prima facie case), we turn
now to the remaining steps: whether General Dynamics articulated
a legitimate nondiscriminatory reason for terminating Hodgens's
employment, and, if so, whether Hodgens has demonstrated, at least
to the level of trialworthiness, that the reason was a pretext, and
that he was, in reality, discharged discriminatorily on the basis
of his having availed himself of a right protected by the Act,
namely, the right to take medically necessary leave time. We
conclude that Hodgens failed to demonstrate that a reasonable trier
of fact could find his inclusion in the RIF to be based on his
having taken FMLA leave.
 A
 Even though Hodgens has established a prima facie case of
retaliation, General Dynamics has articulated a legitimate
nondiscriminatory reason for terminating him. 
 GD stated that Hodgens was transferred out of program
planning and eventually to Module 82 for legitimate business
reasons, including a realignment of staff that resulted from
earlier RIFs, i.e., from RIFs that preceded Hodgens's taking any
FMLA-related medical leave. GD has shown that its April 1994 RIF
was legitimate and economically necessary. And GD has submitted
evidence that Hodgens's performance in Module 82 was below par, in
any event significantly lower than the performance of all similarly
situated Module 82 workers (project managers). For present
purposes, GD has sufficiently articulated a legitimate reason for
its adverse actions against Hodgens. 
 B
 Hodgens cannot and does not claim that an employer cannot
transfer employees from one department to another or reduce the
overall size of its staff if there is a legitimate business reason
to do so. The FMLA certainly does not prevent such transfers or
RIFs. An employer is entitled to reduce and/or reorganize its
staff; efficiency is a legitimate goal. But an employer may not
use its RIF/reorganization/improved-efficiency rationale as a
pretext to mask actual discrimination or retaliation; the mere
incantation of the mantra of "efficiency" is not a talisman
insulating an employer from liability for invidious discrimination. 
See McDonnell Douglas, 411 U.S. at 804 (employer may not use an
ostensibly legitimate reason for an adverse action as a pretext for
discrimination that is prohibited by statute); 29 U.S.C.
 2615(a); 29 C.F.R. 825.220; cf. INS v. Chadha, 462 U.S. 919,
944 (1983): "Convenience and efficiency are not the primary
objectives or the hallmarks of democratic government." Nor are
they the objectives of public policy underlying statutes like the
FMLA or the ADA.
 1
 The competing considerations that underlie a pretext
analysis are especially problematical in a case like Hodgens's. 
Under the McDonnell Douglas framework, in order to rebut the
presumption that arises upon the establishment of a prima facie
case, the employer need only produce enough competent evidence
which, if taken as true, would permit a rational factfinder to
conclude that the challenged employment action was taken for a
"legitimate, nondiscriminatory reason," Burdine, 450 U.S. at 254-
55; accord Hicks, 509 U.S. at 509; Ruiz v. Posadas de San Juan
Assocs., 124 F.3d 243, 248 (1st Cir. 1997). GD has accomplished
this here by offering the testimony of its decision-making
supervisors that GD discharged Hodgens because of his performance
and his non-FMLA absences, and that its decision ignored his FMLA-
protected absences. 
 At this point, Hodgens must demonstrate that there is a
trialworthy issue of pretext. If we were to permit GD's mere
assertion of a legitimate reason to discharge Hodgens to insulate
it against liability, then this employer could circumvent the anti-
discrimination provisions of the FMLA (and of other statutes)
simply by making a unilateral decision to transfer the employee
(Hodgens) to a new work station where he has low seniority and/or
is unable to perform the new job as well as others who have been in
that position for a longer time. That way, when a RIF occurs
(another decision made solely by the employer), Hodgens, as a
recent transferee, would be the low person on the totem pole,
whether the order of termination proceeds based upon seniority in
the position or upon the quality of performance to date. The
decision as to what basis to use in deciding who gets RIFed is, of
course, also a decision made unilaterally by the employer.
 Because of the availability of seemingly neutral
rationales under which an employer can hide its discriminatory
intent, and because of the difficulty of accurately determining
whether an employer's motive is legitimate or is a pretext for
discrimination, there is reason to be concerned about the
possibility that an employer could manipulate its decisions to
purge employees it wanted to eliminate. See Weldon v. Kraft, Inc.,
896 F.2d 793, 798 (3d Cir. 1990) (Subjective evaluations of
performance "are more susceptible of abuse and more likely to mask
pretext" than objective job qualifications.) (internal quotation
marks omitted). The law does not permit this. Even if an
employer's actions and articulated reasons are facially neutral
(e.g., a RIF), if in reality the employer acted for a prohibited
reason (e.g., retaliation for exercising a protected right), then
its asserted legitimate reason for the RIF and its ostensibly
nondiscriminatory selection criteria as to who gets RIFed cannot
insulate it from liability. As Judge Posner wrote in the context
of ADA disability discrimination, "[a] RIF is not an open sesame to
discrimination against a disabled person. Even if the employer has
a compelling reason wholly unrelated to the disabilities of any of
its employees to reduce the size of its work force, this does not
entitle it to use the occasion as a convenient opportunity to get
rid of its disabled workers." Matthews v. Commonwealth Edison Co.,
128 F.3d 1194, 1195 (7th Cir. 1997) (citation omitted). Nor can it
be an opportunity to get rid of workers who exercise their FMLA
right to take medical leave for serious medical conditions. See 29
U.S.C. 2615(a).
 This means that, where a plaintiff in a discrimination
case makes out a prima facie case and the issue becomes whether the
employer's stated nondiscriminatory reason is a pretext for
discrimination, courts must be "particularly cautious" about
granting the employer's motion for summary judgment. Stepanischenv. Merchants Despatch Transp. Corp., 722 F.2d 922, 928 (1st Cir.
1983). Of course, summary judgment is not "'automatically
preclude[d]'" even in cases where elusive concepts such as motive
or intent are at issue. See DeNovellis, 124 F.3d at 306 (quoting
Valles Velazquez v. Chardon, 736 F.2d 831, 833 (1st Cir. 1984)). 
"[I]f the non-moving party rests merely upon conclusory
allegations, improbable inferences, and unsupported speculation,"
summary judgment may be appropriate even where intent is an issue. 
Smith v. Stratus Computer, Inc., 40 F.3d 11, 12 (1st Cir. 1994)
(internal quotation marks omitted). Where, however, the nonmoving
party has produced more than that, trial courts "should 'use
restraint in granting summary judgment' where discriminatory animus
is in issue." DeNovellis, 124 F.3d at 306 (quoting Valles
Velazquez, 736 F.2d at 833); see Stepanischen, 722 F.2d at 928. 
The role of the trial judge at the summary judgment stage "is not
. . . to weigh the evidence and determine the truth of the matter,
but to determine whether there is a genuine issue for trial." 
Anderson, 477 U.S. at 249.
 We recognize that courts in other circuits have addressed
similar FMLA claims and, "[g]ranting [the] plaintiff the benefit of
every favorable inference," have concluded that "the pattern of
actions taken by [the] defendant precludes summary judgment
concerning [the] defendant's motivation." Marx v. Schnuck Markets,
Inc., 76 F.3d 324, 329 (10th Cir.), cert. denied, 116 S. Ct. 2552
(1996) (finding a genuine issue of fact concerning retaliatory
intent when the pattern of conduct began soon after the filing of
a charge and later culminated in actual discharge); see Monica v.
Nalco Chemical Co., No. CIV.A. 96-1286, 1996 WL 736946, at *2 (E.D.
La. 1996) (The fact that one of six absences that employer used as
a basis for terminating plaintiff for excessive absenteeism was an
FMLA-covered absence creates genuine issue of material fact that
his discharge was in retaliation for the FMLA-covered leave.); cf.Victorelli, 128 F.3d at 187-88 (finding material issue of fact as
to whether plaintiff suffered from a serious health condition);
City of Fort Wayne, 117 F.3d 1022, 1027 (7th Cir. 1997) (same);
Rhoads v. FDIC, 956 F. Supp. 1239, 1256 (D. Md. 1997) (same). And
we have held likewise, in analogous contexts. For example, in
Wynne v. Tufts Univ. Sch. of Med., 932 F.2d 19, 27-28 (1st Cir.
1991) (en banc), we held that the record did not contain a
sufficient showing on the movant's part to permit judgment as a
matter of law. We determined that the movant (university) had to
demonstrate that its decision to dismiss the plaintiff (student)
"was a reasoned, professional . . . judgment, not a mere ipse
dixit." Id. at 27. As a result, we "set aside the summary
judgment and remand[ed] th[e] issue for further proceedings." Id.at 28; see Rossy v. Roche Prods., 880 F.2d 621, 626 (1st Cir. 1989)
("All of [the employer's] explanations may in fact be accurate, but
they must be decided after trial, especially in cases such as this
where [the employer's] intent is the central issue."). In those
cases, the courts have left it to the trier of fact to assess
whether the evidence supported the legitimacy of the employer's
stated reason or the employee's allegation of pretext. 
 Of course, those decisions, like all decisions to affirm
or reverse grants of summary judgment, were fact-based. In each
case, the issue was a factual question of motivation: could a
reasonable jury find that the adverse action was taken because of
the employee's protected conduct rather than because of other
nondiscriminatory reasons? 
 The nonmoving plaintiff may demonstrate pretext either
indirectly by showing that the employer's stated reasons for its
adverse action were not credible, or directly by showing that that
action was more likely motivated by a discriminatory reason. SeeBurdine, 450 U.S. at 256. Thus, one way an employee may succeed is
to show "such weaknesses, implausibilities, inconsistencies,
incoherencies, or contradictions in the employer's proffered
legitimate reasons for its action that a reasonable factfinder
could rationally find them unworthy of credence and [with or
without additional evidence and inferences properly drawn
therefrom] infer that the employer did not act for the asserted
non-discriminatory reasons." Hilti, Inc., 108 F.3d at 1323
(internal quotation marks omitted); Weldon, 896 F.2d at 798 (courts
should be sensitive to myriad of ways such an inference can be
created). 
 In addition, close temporal proximity between two events
may give rise to an inference of causal connection. Thus,
"protected conduct closely followed by adverse action may justify
an inference of retaliatory motive." Marx, 76 F.3d at 329; seeOliver v. Digital Equip. Corp., 846 F.2d 103, 110 (1st Cir. 1988)
("A showing of discharge soon after the employee engages in an
activity specifically protected by . . . Title VII . . . is
indirect proof of a causal connection between the firing and the
activity because it is strongly suggestive of retaliation.");
Donnellon v. Fruehauf Corp., 794 F.2d 598, 601 (11th Cir. 1986)
(finding retaliatory pretext based, inter alia, upon employer's
having discharged employee less than one month after her filing a
discrimination charge); cf. Hilti, Inc., 108 F.3d at 1325 ("Morgan
has established a prima facie case of FMLA retaliation, in that
Hilti sent her a letter of discipline concerning attendance
problems on the day she returned from the leave.").
 In assessing discriminatory motive, a court may also
consider other factors, including "among other things, 'the
historical background of the . . . decision'; '[t]he specific
sequence of events leading up to the challenged decision';
'[d]epartures from the normal procedural sequence'; . . . '[any]
contemporary statements by members of the decisionmaking body,'"
Reno v. Bossier Parish Sch. Bd., 117 S. Ct. 1491, 1503 (1997)
(quoting Arlington Heights v. Metropolitan Hous. Dev. Corp., 429
U.S. 252, 267-68 (1977) (alterations in Reno)); United States v.
Yonkers Bd. of Educ., 837 F.2d 1181, 1221 (2d Cir. 1987), and
"[s]ubstantive departures . . . , particularly if the factors
usually considered important by the decisionmaker strongly favor a
decision contrary to the one reached," Arlington Heights, 429 U.S.
at 267-68; Yonkers Bd. of Educ., 837 F.2d at 1221. In addition,
"doubts about the fairness" of an employer's decision or an
employer's "'misjudg[ing]'" of an employee's qualifications, while
not necessarily dispositive, "'may be probative of whether the
employer's reasons are pretexts for discrimination.'" Ezold v.
Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)
(quoting Burdine, 450 U.S. at 259).
 2
 Applying these principles, we must determine whether
there is sufficient evidence favoring Hodgens for "a fair-minded
jury [to] return a verdict in his favor," Anderson, 477 U.S. at
252, i.e., for a jury to conclude that Hodgens's discharge was
motivated by retaliation for his having availed himself of a right
protected by the FMLA, namely, the right to take medically
necessary leave time. We have already examined, in a different
context, GD's stated reasons for discharging Hodgens. In Part
III(B), supra, we determined that Hodgens had produced sufficient
evidence to satisfy the low threshold required to meet the third
prong of his prima facie case, i.e., that there was a causal
connection between his protected medical leave and his losing his
job. Because GD has met Hodgens's prima facie case by articulating
its facially nondiscriminatory reasons for terminating him, we must
now examine whether Hodgens has produced sufficient evidence for a
rational jury to conclude that those reasons were a pretext for
discrimination.
 Based on the record here, a rational jury could not reach
such a conclusion. It is undisputed that a number of Hodgens's
problems on the job took place long before he took his first
medical leave. For example, in 1985, in a previous RIF, GD closed
down Hodgens's prior work site in Quincy altogether. Hodgens was
out of work for three years as a result. After he was re-hired at
the Quonset Point facility and doing well for three years, the
program planning function in which he was excelling was eliminated
in 1991, resulting in his reassignment to production control. This
was still two years before the onset of the medical conditions at
issue in the present case, June 1993. For the year beginning
March 1, 1991, Hodgens's performance was ranked eighth out of ten
employees in his peer group, and the two employees who ranked
behind him were laid off that year as part of another RIF. In the
year beginning March 1, 1992, Hodgens ranked seventh of eleven in
his rank group. Hodgens's poor performance in the two years
preceding his illness was a source of great concern to him,
particularly as it related to the possibility that he might become
the next casualty of GD's efficiency-related RIFs. 
 Shortly before the first relevant manifestation of his
heart problems, Hodgens was reassigned to work in Module 82, where
his performance problems became even worse. He worked on Module 82
between April and early August 1993. Thus, even without parsing
the competing evidence as to which portions of Hodgens's poor
performance on Module 82 were related or unrelated to the absences
caused by his HBP and his potential heart condition, we note that
all of the foregoing events putting Hodgens in an extremely
unfavorable position at work occurred prior to his taking any
FMLA-protected medical leave. This is obvious with respect to the
period prior to his being assigned to Module 82; and it also
applies to his poor performance in Module 82 between April and
August 1993, which preceded his FMLA-protected leave. So none of
these events could have been motivated by Hodgens's having taken
FMLA-protected leave. 
 Further, Hodgens failed to submit any evidence, direct or
circumstantial, that General Dynamics's well-justified and
documented decision to lay off more workers in April 1994 was a
mere pretext for retaliation against Hodgens for exercising his
right to take medical leave. On the contrary, the RIF itself seems
real enough and the legitimate business need for it remains
unshaken. There were RIFs before Hodgens became ill, and there is
no evidence that there was anything pretextual about GD's general
business strategy of reducing its work force in order to maintain
its profit levels. 
 Nevertheless, while the RIF as a whole appears
legitimate, there remains the question of whether GD's selection of
Hodgens in particular to be laid off was based in any way upon his
having exercised his FMLA right to take necessary medical leave. 
GD presented evidence that Hodgens's ranking for the year beginning
March 1, 1993 (including the period of his Module 82 position as
well as the period of his FMLA-protected absences, plus less than
one month in the machine shop to which he half-heartedly argues he
would not have been assigned if he had not taken FMLA leave) was
based on a comparison with those senior planners having similar
duties, and that he ranked lowest among his peers in terms of
performance. Hodgens himself told his doctor that he was
experiencing pressure at work because of a "decrease in performance
because of inexperience in [his] present job."
 In order to overcome the weight of these facts, Hodgens
offered the following evidence to dispute the legitimacy of GD's
rationale for including him in the layoff, i.e., to show that it
was a mere pretext: (1) shortly after he returned from a
significant amount of FMLA-protected medical leave, his supervisor
told him he should do something to reduce his "excessive absences";
(2) his evaluation contained the statement, "Make every effort to
have your absenteeism fall within the company guidelines"; (3) his
termination was based on the low performance evaluation which he
received shortly after returning from his protected medical leave,
and this temporal proximity bespeaks a retaliatory intent; and
(4) a memorandum, entitled "Justification Regarding Drop in Rank
Position," specifically acknowledged that his absentee rate was a
factor in his low performance rating and therefore in his
termination. Thus, in the language of Arlington Heights, Hodgens
contends that the "specific sequence of events" leading up to his
termination, coupled with the contemporary statements by his
supervisor (written and oral) warning him about his "excessive
absences," constitute proof that GD's decision to terminate him was
motivated by his having availed himself of FMLA-protected medical
leave. Arlington Heights, 429 U.S. at 267-68. We will discuss
these facts seriatim although, in evaluating their sufficiency to
withstand summary judgment, we must consider them in combination,
not each standing alone.
 As noted supra, close temporal proximity between two
events may give rise to an inference of causal connection. 
Therefore, "it may be significant that [Hodgens's termination, and
the warning that preceded it, occurred] shortly after his having
taken FMLA leave." Williams v. Shenango, Inc., 986 F. Supp. 309,
322 (W.D. Pa. 1997) (denying summary judgment to employer because
a reasonable factfinder could find employer's articulated reasons
for suspending and terminating employee to be pretexts for
discrimination based on having taken FMLA leave); see Marx, 76 F.3d
at 329 (same). 
 While Hodgens is correct that temporal proximity may give
rise to a "suggest[ion] of retaliation," Oliver, 846 F.2d at 110,
that "suggest[ion]" is not necessarily conclusive. We must
remember that it is the employee's burden to show pretext,
sufficient to survive summary judgment. This is a question of
fact, the resolution of which is usually left to the trier of fact. 
 Here, the circumstantial fact of temporal proximity is
weakened considerably by the history of GD's prior non-
discriminatory RIFs and of Hodgens's poor work performance. To
strengthen his case, Hodgens has produced evidence that his
supervisor specifically referred to his "excessive absences" and
his termination was based on an evaluation and justification memo
reflecting the same concern. According to Hodgens, these
contemporaneous statements by the decision-making authority (or its
agent) demonstrate persuasively that GD's decision to rank him at
the bottom of his peer group and to choose him as the employee from
that group to lay off in the 1994 RIF were motivated by retaliatory
animus. The inference is strengthened by the fact that Hodgens had
a good work history for three of the five years since he was
rehired by GD at Quonset Point and for twenty years previously in
Quincy. On the other hand, the inference is weakened by his
performance problems over the two years prior to his taking FMLA-
protected medical leave, although it must be remembered that
Hodgens survived the earlier RIFs, even if only by the skin of his
teeth.
 Statements by supervisors carrying the inference that the
supervisor harbored animus against protected classes of people or
conduct are clearly probative of pretext, Kelley v. Airborne
Freight Corp., ___ F.3d ___, ___, 1998 WL 150958, at *10-*11 (1st
Cir. April 7, 1998) (Remark that it would be a good time "to get
rid of some of the older mediocre managers" had a "direct bearing
on age discrimination."); EEOC v. G-K-G, Inc., 39 F.3d 740, 746
(7th Cir. 1994) (Comment by supervisor that the plaintiff's
"accounts could use some younger blood" constituted sufficient
direct evidence of discriminatory intent.); Lindahl v. Air France,
930 F.2d 1434, 1439 (9th Cir. 1991) (Sexist comments reflecting the
supervisor's stereotypical images of men and women raised a genuine
issue of fact with respect to pretext.); Morgan v. Arkansas-
Gazette, 897 F.2d 945, 951 (8th Cir. 1990) (City circulation
manager's statements that the plaintiff was "an old fuddy-duddy"
constituted direct evidence that the defendant's reason for
discharging the plaintiff was a pretext for age discrimination.),
even if that inference is not the only one that could be drawn from
the comment, Binder v. Long Island Lighting Co., 933 F.2d 187, 192-
93 (2d Cir. 1991) (Statement that plaintiff was overqualified for
position raised an issue of material fact with regard to pretext in
an age discrimination case.).
 GD argues that the statements by Hodgens's supervisor are
not as damning as Hodgens would have us believe: they refer only
to his "excessive absences," and GD has offered evidence that a
great many of Hodgens's absences were not FMLA-protected. Cf.Hilti, Inc., 108 F.3d at 1322, 1324-25 (finding no genuine issue
regarding pretext where employee had a long history of excessive
absenteeism over the years, about which she had received several
warnings well before she took any FMLA-protected leave). According
to GD, the supervisor was primarily referring to non-protected
absences, rendering these statements a great deal less than a
"smoking gun."
 Hodgens disputes the merits of GD's attempt to parse his
absences into FMLA-protected and non-FMLA-protected. He argues
that it was not unreasonable for him to remain absent from work for
medical reasons during the entire period that he did, because
during this time his physician performed diagnostic tests in an
effort to determine how serious his medical condition was and, if
indeed it was heart-related, whether it would be safe for him to
return to work before it was brought under control. Dr. Wilkinson
was "most concerned" that his symptoms and history could indicate
that he was suffering from angina, which she was never able to rule
out during the entire period of nearly two months that Hodgens was
out of work. If he was suffering from angina, then any stress,
including work, would increase the chance that he could have a
heart attack. Similarly, his atrial fibrillation, if not treated
properly, could lead to a stroke.
 The problem that Hodgens cannot overcome is that, while
Dr. Wilkinson may indeed have been concerned about his condition,
she did not tell him that his medical condition required him to
stay home from work from August 4 through September 21, 1993. To
the contrary, while she thought it was "reasonable" for Hodgens to
want to stay home from work pending the outcome of his tests, she
in fact recommended that he return to work despite his medical
condition and its potential risks. As GD notes, Hodgens could, for
example, have kept any given medical appointment in the morning,
and then come back to work for the remainder of the day, which he
did do on some occasions but not on others. Thus, apart from the
period from September 22-27, while Hodgens's medical condition
clearly did require him to be absent from work during the times
necessary for his medical visits, it did not require the vast
majority of his absences during August and September. The
remainder of his absences between August 4 and September 21 as well
as after September 27 were therefore not protected by the FMLA, 
i.e., the time that was not actually necessary for him to attend
medical appointments related to his heart condition. GD was not
precluded from taking those unprotected absences into account in
evaluating Hodgens's performance and in determining whether to
include Hodgens in the RIF.
 The question of summary judgment here is a close one
because both GD and Hodgens have presented probative evidence
tending to support their respective versions of the facts, on the
question whether GD's reason for discharging Hodgens was legitimate
or merely a pretext to retaliate against him for taking FMLA-
protected medical leave. The weighing of such alternative factual
scenarios would ordinarily be left to the finder of fact after
trial. But on this record, the weight of the evidence does not
"present[] a sufficient disagreement to require submission to a
jury"; it is "so one-sided that one party must prevail as a matter
of law." Anderson, 477 U.S. at 251-52. No rational factfinder
could reasonably conclude that GD terminated Hodgens in retaliation
for exercising his rights under the statute: the vast majority of
Hodgens's absences were not FMLA-protected; overwhelming evidence
demonstrated his poor performance, during two full years prior to
his protected medical leave plus during the portion of the 1993-94
evaluation year that preceded his medical leave; and the evidence
Hodgens offered was simply insufficient to outweigh the foregoing,
such that a factfinder could infer pretext. Because "a fair-minded
jury could [not] return a verdict for [Hodgens] on the evidence
presented," Anderson, 477 U.S. at 252, we affirm the grant of
summary judgment on the FMLA claim.
 V
 Hodgens also makes a claim under the ADA. We affirm the
district court's grant of summary judgment on the ADA claim on the
same basis that we affirm on the FMLA claim. Hodgens never
demonstrated, to the level of sufficiency required on a motion for
summary judgment, that GD's stated reason for terminating him a
RIF based on his performance was a pretext for his asserted
disability. Hodgens has certainly not made any more persuasive a
demonstration that his layoff was a pretext for discrimination
based on his disability than he did to show that it was a pretext
for retaliation based on his having taken FMLA leave.
 Therefore, his ADA claim must fail, and the grant of
summary judgment to General Dynamics must be affirmed, albeit on a
different basis than that relied upon by the district court. We
will affirm a correct result reached by the court below "on any
independently sufficient ground made manifest by the record." 
Palmacci v. Umpierrez, 121 F.3d 781, 792 (1st Cir. 1997); AIDS
Action Comm. of Mass. v. MBTA, 42 F.3d 1, 7 (1st Cir. 1994)
(internal quotation marks omitted). We need not decide whether the
district court was correct in holding that certain of Hodgens's
medical conditions (HBP and atrial fibrillation) did not constitute
a disability within the meaning of the ADA, and in particular,
whether deciding that issue should proceed with or without
consideration of Hodgens's ameliorative medications. See Arnold,
136 F.3d 854.
 The grant of summary judgment to General Dynamics is
Affirmed. No costs to either party.